**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0617n.06
Filed: August 24, 2007

**No. 06-1072**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| RICHARD LEE BOWDEN, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Appellant. | ) | |

Before: KENNEDY, MARTIN and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Richard Bowden challenges the district court's decision, after a *Booker* remand, to sentence him to a 168-month term of imprisonment, the same sentence he originally received. Relying on an intervening Fourth Amendment decision, he also challenges his underlying conviction for possession of cocaine with intent to distribute upon which the original (and subsequent) sentence is based. We affirm the sentence and reject Bowden's new challenge to his conviction.

I.

Early in the afternoon of September 6, 2001, Officers Brian Beauchamp and Michael Hecht of the Kalamazoo (Michigan) Valley Enforcement Team, an undercover narcotics group, went to 521 Harding Place to investigate an informant's tip that Richard Bowden was selling crack from the

residence. The home was owned and occupied by Bowden's 77-year-old father, Cleveland, but Bowden maintained a room there and stayed at the residence from time to time. When the officers arrived, Bowden consented to a walk-through search of the residence on the condition that the officers would not open drawers or look under couches or beds.

During the walk-through, the officers discovered a plastic baggie with the corners ripped off in a bedroom and a similar baggie on top of the refrigerator containing pills. Bowden claimed that the pills were Vicodin prescribed to treat pain associated with a tooth ailment, but he could not locate the prescription or the prescription bottle nor name the doctor who prescribed the pills or the pharmacy that filled the prescription. Officer Beauchamp asked Bowden about his criminal history; Bowden acknowledged one prior conviction, but a subsequent call to the dispatcher revealed that he had two prior convictions.

At that point, Officer Beauchamp asked Bowden for his consent to a thorough search of the residence. Bowden declined, explaining that he had to go somewhere with his sister. The officers told him that he was free to leave but that they would secure the house in his absence and obtain a search warrant.

After Bowden left, Officer Hecht informed Cleveland, who was in his room, what had happened. Cleveland said that he would allow the officers to search the house, save for Bowden's bedroom, so long as his daughter Dorothy was present. While waiting for her to arrive, Officer Beauchamp performed a protective sweep of the basement (observing baggies he thought could be

used for drug packaging and a marijuana roach) and called for backup. Sergeant Earle Martin and Officer Brett Hake responded to the call and soon arrived at the home.

Upon Dorothy's arrival, Sergeant Martin verified Cleveland's continued assent and the officers began searching the house. Bowden soon reappeared on the scene (about 20 minutes after he had left), and Officer Beauchamp secured his consent to search his bedroom. There the officer found what appeared to be drug tabulations and began asking Bowden about an individual the informant had advised was a drug associate. Bowden responded by revoking his consent to the search.

Officer Beauchamp immediately stopped searching, left the bedroom and descended the stairs. As he exited the house, he received a two-way-radio call from Officer Hake asking that he come to the garage. On the way there, Officer Beauchamp encountered Cleveland and several other family members, who had congregated on the front porch. Cleveland informed him that he too was now revoking his consent to the search.

Officer Beauchamp proceeded to the garage, where Officer Hake showed him crack cocaine that he had found in a sock. Beauchamp determined that the cocaine had been located prior to either revocation. The officers then obtained a warrant to search the residence. In accordance with the warrant, they found a .22 caliber gun near where the officers found the drugs and a men's shaving kit containing $15,520 and two pay stubs made out to Bowden hidden in the basement ceiling.

A federal grand jury charged Bowden with possessing 50 grams of cocaine base with intent to distribute. *See* 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii). Bowden filed a motion to suppress the evidence found at his father's residence, which the district court denied. A jury found Bowden guilty of the charge. The district court calculated a guidelines range of 168–210 months and sentenced him to 168 months' imprisonment.

Bowden appealed his conviction and sentence, arguing among other things that the police did not obtain proper consent to search the residence and that the district court incorrectly applied a firearm-possession enhancement to his sentence. We rejected both arguments and affirmed. *See United States v. Bowden*, 380 F.3d 266 (6th Cir. 2004).

The Supreme Court asked us to reconsider the sentence based on its recently decided *Booker* decision. *Bowden v. United States*, 544 U.S. 902 (2005). On remand, we "reinstate[d] our opinion . . . affirming Bowden's conviction," vacated his sentence and remanded for resentencing. *United States v. Bowden*, 408 F.3d 847, 847 (6th Cir. 2005).

On remand, after exercising its post-*Booker* discretion, the district court imposed a 168-month prison sentence. The court entered the amended judgment on January 4, 2006; Bowden appealed that judgment on January 12; and the Supreme Court decided *Georgia v. Randolph*, 547 U.S. 103 (2006), on March 22.

II.

Bowden raises two issues on appeal—(1) that his new sentence is procedurally and substantively unreasonable and (2) that his conviction rests on improperly admitted evidence because the police violated the Fourth Amendment, as interpreted by *Randolph*, when they searched the home on the basis of his father's consent after Bowden expressly declined to consent to the search.

A.

A procedural challenge to a sentence requires us to consider whether the district court appreciated the advisory nature of the guidelines, correctly calculated the guidelines range and considered the 18 U.S.C. § 3553(a) factors in exercising its independent judgment in imposing a sentence. *United States v. McBride*, 434 F.3d 470, 476 (6th Cir. 2006). Because Bowden did not object on any of these procedural grounds when the district court gave him the chance to do so at the end of the sentencing hearing, we limit our review on that score to plain error. *See* JA 283 (After announcing the sentence, the district court asked whether any "objections . . . complaints, comments, or anything else for the record" "ha[d] emerged"; Bowden's counsel responded, "No, Judge."); *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004); *see also United States v. Bailey*, 488 F.3d 363, 367 (6th Cir. 2007) (explaining that "when the district court asks at sentencing whether there are any objections to the sentence and the appellant raises none, we review the sentence only for plain error"); *United States v. Saffore*, 216 F. App'x 531, 532–33 (6th Cir. Feb. 6, 2007) (unpublished); *United States v. Harden*, 195 F. App'x 382, 385 (6th Cir. Aug. 16, 2006)

(unpublished); *United States v. Carroll*, 189 F. App'x 450, 454 (6th Cir. July 19, 2006) (unpublished).

The district court did not commit plain error. It acknowledged the "discretionary" nature of the guidelines range. JA 270–71. It "confirm[ed]" that 168–210 months was "the correct guideline range calculation," JA 270, a finding Bowden does not contest. And it considered the § 3553(a) factors. In addition to the guidelines range, 18 U.S.C. § 3553(a)(4), the court expressly touched upon the nature and circumstances of Bowden's offense, *id.* § 3553(a)(1); his history and personal characteristics, *id.*; the treatment he should receive while in prison, *id.* § 3553(a)(2)(D); the kinds of sentences available, *id.* § 3553(a)(3); *see also United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006); and the goal of sentencing similar defendants consistently, 18 U.S.C. § 3553(a)(6).

While Bowden claims that the court failed to consider his mitigation arguments, *see United States v. Richardson*, 437 F.3d 550, 554 (6th Cir. 2006), the sentencing transcript does not back him up. The court acknowledged receiving Bowden's sentencing memoranda, summarized Bowden's mitigation arguments and explained that the goal of the hearing was to "guide the Court with respect to" its discretionary sentencing decision. JA 269–70. The court then responded to several of Bowden's contentions during the hearing. It explained that "the activities that the defendant has engaged in [in prison] are the kinds of self-improvement activities which [it] would normally expect as a baseline minimum in terms of behavior." JA 271. While the court "underst[ood]" one of defendant's argument[s]" to be "predicated mainly on the idea that the defendant had some kind of lack of intense parental monitoring growing up," it rejected the contention, noting that to do

otherwise would suggest that "the Court should be encouraged to impose a harsher sentence for someone who had the opportunity for parental guidance." JA 277–78. The court questioned Bowden's alleged remorse, characterizing his apology as expressing that "he's sorry that he was found in a position which . . . made him responsible through constructive possession, but he really didn't do anything anyway." JA 279.

While Bowden complains that the district court did not expressly address each of his arguments, such as his employment record and his family responsibilities, nothing shows that it failed to consider them. And when the district court adequately explains all of the reasons for the sentence it did select, as here, it need not expressly reject all of the reasons for the sentence it did not select. *See United States v. Gale*, 468 F.3d 929, 940 (6th Cir. 2006); *United States v. Jones*, 445 F.3d 865, 871 (6th Cir. 2006). "[G]iven the straightforward, conceptually simple arguments before the judge, the judge's statement of reasons here, though brief, was legally sufficient." *Rita v. United States*, 127 S. Ct. 2456, 2468 (2007).

Bowden's substantive challenge to his sentence fares no better. He first urges us to "re-visit" our practice of giving procedurally proper, within-guidelines sentences a presumption of reasonableness. Br. at 22; *see Williams*, 436 F.3d at 708. The Supreme Court's *Rita* decision, however, upholds that presumption. *See Rita*, 127 S. Ct. at 2462.

The 168-month sentence imposed by the district court is reasonably calculated to comply with the purposes of sentencing set out in § 3553(a)(2). The sentence is at the very bottom of the

applicable guidelines range. Nothing about Bowden's specific circumstances demonstrates that such a sentence is unreasonable. While he relies heavily upon his behavior in prison between the two sentencing hearings, we have generally held that "[p]ost-sentencing events or conduct simply are not relevant" in *Booker* remands. *United States v. Worley*, 453 F.3d 706, 709 (6th Cir. 2006) (internal quotation marks omitted); *see also United States v. Monday*, 218 F. App'x 419, 424–25 (6th Cir. Feb. 26, 2007) (unpublished) (same); *United States v. Smith*, 208 F. App'x 425, 427 (6th Cir. Dec. 18, 2006) (unpublished) (vacating reduced sentence entered on *Booker* remand because district court based reduction upon "post-sentencing rehabilitation efforts"); *cf.* U.S.S.G. § 5K2.19 ("Post-sentencing rehabilitative efforts, even if exceptional, undertaken by a defendant after imposition of a term of imprisonment . . . are not an appropriate basis for a downward departure when resentencing the defendant for that offense."). Bowden attempts to distinguish these cases by saying that the evidence corroborates his claim that he is an industrious, responsible, good person who made a mistake, not that he has reformed since the initial sentencing hearing. Even if we were to accept this distinction, which we need not decide today, Bowden's insistence that he can be a productive member of society does not cut completely in his favor—for he has turned to crime in the past despite this ability. *Cf. United States v. Roberson*, 474 F.3d 432, 435 (7th Cir. 2007) ("The better off a defendant is, the better chance he has to go straight when he is released from prison—but the more inexcusable his criminal conduct."). It also remains difficult to gauge Bowden's claim that his crime was an "aberrational act," Br. at 22, since he has never forthrightly confessed that what he did was wrong or for that matter ever explained why he committed the crime.

Bowden persists that a sentencing court "could well conclude" that a within-guidelines sentence was too lengthy given the "specific and somewhat unusual facts" of his case. Br. at 24. Maybe so. But that is not the question; the question is whether the district court reasonably exercised its discretion in imposing this sentence—which it did and which is all we have authority to consider in deciding whether to affirm this aspect of the sentence.

B.

Bowden also attacks the propriety of his conviction, a conviction that we have affirmed not once but twice. The Supreme Court moreover directed us to reconsider this case only "in light of *United States v. Booker*," *Bowden*, 544 U.S. at 902, not with regard to any other matters. *See United States v. Haynes*, 468 F.3d 422, 426 (6th Cir. 2006) ("Remands 'in light of *Booker*' are concerned with sentencing . . . . [H]ad the Supreme Court intended that the remand be in regard to any other issue, it would have so stated."). Bowden responds that a criminal judgment generally is not treated as final until the conviction *and* sentence have been established; that under *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), he is entitled to the benefit of Supreme Court decisions issued while his case is on direct review—most notably, *Georgia v. Randolph*, 547 U.S. 103 (2006); and that he therefore may challenge his conviction based on *Randolph*. In his view, *Randolph* requires suppression of the evidence obtained from the garage because his father, the owner of the house, could not give valid consent to search the premises once Bowden revoked his own prior consent to search the house.

We need not resolve this debate because, even if we were permitted to reconsider the propriety of this conviction based on *Randolph* and even if *Randolph* covered this search—two points we need not decide—Bowden faces a separate problem. As the district court correctly found, the inevitable-discovery doctrine bars his claim.

As an exception to the "fruit of the poisonous tree" doctrine, *see Nix v. Williams*, 467 U.S. 431, 441–42 (1984), the inevitable-discovery doctrine provides that, where "the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered," *Murray v. United States*, 487 U.S. 533, 539 (1988). The doctrine thus avoids "put[ting] the police in a worse position than they would have been in absent any error or violation." *Nix*, 467 U.S. at 443. We have applied the rule in two settings: (1) when an "independent, untainted investigation . . . inevitably would have uncovered the same evidence"; or (2) when there exist "other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995). As we have made clear, "an alternate, independent line of investigation is not required for the inevitable discovery exception to apply." *Id.* at 499–500. And in trying to predict what would have happened had the initial search been suspended, we "focus[] on demonstrated historical facts capable of ready verification or impeachment." *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (internal quotation marks omitted).

The Supreme Court and our circuit have applied the doctrine in several cases where, like this one, a potentially illegal search was followed by a search conducted in accordance with a valid

search warrant premised on evidence of probable cause developed independently of the initial search. *See, e.g.*, *Murray*, 487 U.S. at 541–43 (remanding case for consideration of the inevitable-discovery doctrine where police conducted an initial, illegal search and later conducted a second, legal search in which they seized marijuana); *Segura v. United States*, 468 U.S. 796, 813–16 (1984) (holding that contraband would have been inevitably discovered where agents conducted a warrantless search while obtaining a search warrant and later conducted a second, legal search in which agents discovered contraband); *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002) ("Thus, *Murray* teaches that the inevitable discovery exception . . . applies when, as in the instant case, evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first.").

*Keszthelyi* in particular involved facts quite similar to those here. Consistent with a search warrant, agents searched the defendant's home for cocaine on October 8 and found guns, cash, a digital scale, pills, syringes and surveillance equipment, but not cocaine. *Id.* at 563. On October 9, an agent returned to the home because he believed that "there was something there that had not been located during the initial search," and he discovered cocaine behind a moveable oven in the defendant's kitchen. *Id.* (internal quotation marks omitted). On October 11, the agent obtained a new search warrant based on an affidavit summarizing the information from the searches conducted on October 8 and 9. *Id.* Nothing was found in the last search on October 11. *Id.* at 564. We held that although the October 9 search was illegal, "the district court properly denied defendant's motion to suppress the fruits of the October 9 search" because "the cocaine seized during [the October 9]

- 11 -

search inevitably would have been discovered during the lawful execution of a second search warrant on October 11." *Id.* at 573.

As in *Keszthelyi*, the officers here collected information prior to the allegedly illegal search that, by itself, sufficed to establish probable cause for the second search. At "the instant before" Cleveland's daughter arrived at the residence and the police began searching, *Kennedy*, 61 F.3d at 498 (internal quotation marks omitted), the following information connected the residence to illegal drug activity: (1) An informant told the police that Richard Bowden, who drove a "burgundy drop-top Buick" and stayed in a "pink house on Harding Place," was selling drugs, JA 113; (2) the informant's testimony was corroborated when the police arrived at 521 Harding Place (a pink house), observed the vehicle parked in the street (a like-colored Buick) and met Richard Bowden; (3) during the initial consensual walk-through, the police observed a baggie that they suspected was used for drug trafficking in the bedroom and a baggie full of Vicodin pills in the kitchen whose legal source Bowden could not identify; (4) during the same walk-through, Bowden gave an incomplete answer regarding his criminal history, which included two prior drug convictions (for possessing with intent to distribute and manufacturing an imitation controlled substance); and (5) during the protective sweep of the basement, an officer observed drug-packaging materials and a marijuana roach, *see United States v. Taylor*, 248 F.3d 506, 513 (6th Cir. 2001) ("[T]he police may conduct a limited protective sweep to ensure the safety of those officers . . . left behind to secure the premises while a warrant to search those premises is obtained.").

As the district court found, the officers already had formed the "intent to obtain . . . a search warrant" before they commenced the allegedly illegal search. JA 247. That is what they told Bowden they would do when he initially left the residence. And that is what they did when the father, Cleveland, revoked his consent to a search. The officers submitted an affidavit in support of the search warrant that "sets forth in paragraph C the facts relied upon by the police in connection with their tip to visit [Bowden's] house," JA 229–30, and it "sets forth the contacts which the police had with the defendant and his father, the alleged consents to search, the discovery of various suspicious items, including suspicious baggies and a baggie containing Vicodin pills, and the discovery of the crack cocaine." Defendant's Memo to D. Ct. at 3; JA 19. As in *Keszthelyi*, "the untainted portions of the affidavit were sufficient to motivate the [legal] search and would have been sufficient to convince a neutral magistrate of the existence of probable cause." *Keszthelyi*, 308 F.3d at 575; *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (probable cause to search a residence exists when "there is a fair probability that contraband . . . will be found in a particular place").

Nor is there any reason to think that the officers, once in possession of a warrant, would not have discovered the drugs in the garage. One of the officers previously (and legally) had seen Bowden acting suspiciously there before he left the premises. *See* JA 122. And given that the same officer searched the garage after the warrant was obtained, there can be little doubt that he would have located the cocaine. *See* JA 218; *see also Keszthelyi*, 308 F.3d at 575 ("The fact that the lawful October 11 search covered the same area, and involved many of the same agents, as the illegal October 9 search minimizes our need to speculate about whether the cocaine inevitably would have

been discovered during the later lawful search."). On this record, the inevitable-discovery doctrine applies, and accordingly Bowden's challenge to his conviction must fail.

This analysis also helps to answer the question posed by *Nix*: What position would the police have been in had the search in connection with the father's allegedly invalid consent never occurred? *See Nix*, 467 U.S. at 443. As found by the district court, this evidence would have been discovered. The police already had sufficient information from the prior legal search and an informant to obtain a warrant. The officers planned to obtain a warrant and secure the premises if consent to search had not been given, a strategy allowed by *Segura*, 468 U.S. at 810, 814. After the officers believed they no longer had authority to continue searching, they did exactly what they had planned; they secured the premises and obtained a search warrant. If they had done this before the alleged violation, they would have discovered all of the evidence Bowden asks us to suppress. To suppress this evidence "would put the police in a worse position"—just what the Supreme Court has proscribed. *Nix*, 467 U.S. at 443.

Doubtless, the inevitable-discovery doctrine does not permit police, who have probable cause to believe a home contains contraband, to enter a home illegally, conduct a warrantless search and escape the exclusionary rule on the ground that the "police *could* [have] obtain[ed] a warrant yet cho[]se not to do so." Dissent at 3. We have not applied the doctrine to so-called "one-search case[s]," in which the evidence was not independently discovered in connection with "a *second search* pursuant to a valid warrant" that was not tainted by the original search. *Dice*, 200 F.3d at 985–86 (rejecting the inevitable-discovery doctrine where police violated the knock-and-announce

- 14 -

requirement while executing a warrant and did not conduct a second search), *abrogated on other grounds by Hudson v. Michigan*, 126 S. Ct. 2159 (2006). No such problem occurred here, however. Police act well within constitutional limits when they seek consent for a search, continue the search until consent is withdrawn, then obtain and execute a search warrant based on information collected during the consented-to search. Prior to Bowden's revocation of consent, the police already had gathered sufficient information to support the search warrant they later obtained. Where such "compelling facts establish[] that the disputed evidence inevitably would have been discovered," *Keszthelyi*, 308 F.3d at 574, suppressing the evidence "would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a *worse* one," *Murray*, 487 U.S. at 541; *see also Nix*, 467 U.S. at 443.

*United States v. Haddix*, 239 F.3d 766 (6th Cir. 2001), does not lead to a different outcome. A police helicopter "spotter" identified marijuana growing behind the defendant's home, and police illegally entered the home without a search warrant, discovered guns and marijuana and arrested the defendant. *Id.* at 766. In response to the defendant's claim that the evidence should be suppressed, the government argued that the inevitable-discovery doctrine should apply whenever "the police could have obtained a warrant but did not do so—that is, whenever probable cause would have existed had a magistrate considered the question in advance of the search." *Id.* at 768. Worse than that, the government maintained that "evidence that would constitute probable cause for a warrant, even when that evidence's existence is unknown to the police, is inherently destined to be 'inevitably discovered.'" *Id.* Under this theory, the police would need a warrant whenever they could not get

one (because there was insufficient evidence of probable cause before or after the search), and they would not need a warrant whenever they could get one (because they already had evidence of probable cause or discovered it during the illegal search). That is not what the court means by inevitable discovery or inevitable non-discovery. Otherwise, as *Haddix* correctly observed, the warrant requirement would be "completely obviate[d]." *Id.* (internal quotation marks omitted). What we mean by inevitable discovery is that the government obtained the evidence "through an independent source," *Murray*, 487 U.S. at 539, untainted by the initial illegal (or, as here, initial allegedly illegal) search. Here, unlike *Haddix*, the government did not need to rely on evidence discovered on an allegedly illegal basis to support the warrant it obtained. The legal evidence the government previously had was sufficient to support the warrant and accordingly the inevitable-discovery doctrine applies.

III.

For these reasons, we affirm.

BOYCE F. MARTIN, JR., Circuit Judge, dissenting. I disagree with the majority's interpretation of the inevitable discovery doctrine, and therefore respectfully dissent.

I.

The Supreme Court has stated that inevitable discovery is "an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *Murray v. United States*, 487 U.S. 533, 539 (1988). The Court's seminal inevitable discovery case was *Nix v. Williams*, in which police obtained a statement from the defendant in violation of his Sixth Amendment rights that led to the discovery of the body of his murder victim. 467 U.S. 431 (1984). The Court reversed a grant of habeas to the defendant based on the use of evidence regarding the body at trial, finding that the exclusionary rule should not bar admission of evidence related to the body. *Id.* at 449-50. The Court held that the "inevitable discovery" exception to the exclusionary rule applied because a search party, conducted entirely independently of the police interrogation of the defendant, was in the area of the body and would have discovered it even without the defendant's statement. *Id*. *See also Murray*, 487 U.S. at 542 (holding that the related independent source rule could potentially apply on remand despite illegal police entry into a warehouse containing marijuana where police had legitimately gained probable cause prior to entry and separately obtained a warrant for entry if "the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence").

This court has articulated that the inevitable discovery doctrine may apply in situations where there is either an independent, untainted investigation as in *Nix*, *see United States v. Dice*, 200 F.3d 978, 986 (6th Cir. 2000); *United States v. Haddix*, 239 F.3d 766, 769 (6th Cir. 2001)*,* or where there exist "other compelling facts establishing that the disputed evidence inevitably would have been discovered," *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002); *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996); *United States v. Johnson*, 22 F.3d 674, 684 (6th Cir. 1994). The "other compelling facts" inquiry is not entirely open-ended, however. The most common scenario in which other compelling facts would justify inevitable discovery is where the government can show that "routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *Keszthelyi*, 308 F.3d at 574. For example, where a law enforcement policy calls for the seizure and inventory of a lost suitcase or an impounded car, such a policy — if legal — can be used to demonstrate that the evidence would inevitably have been discovered. *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995) (lost suitcase); *Johnson*, 22 F.3d at 674 (discussing in dicta an inventory search of an impounded car).

In this case, the government does not attempt to make any showing of either an independent, untainted investigation or of a routine police procedure that would have led to the discovery of the crack cocaine. Instead it argues simply that the police ***could*** have obtained a warrant, if they had attempted to do so, once Bowden revoked his consent and they no longer had lawful authority for the search. Whatever confusion might be raised by the "other compelling facts" inquiry of inevitable

discovery, the argument that police ***could*** have obtained a warrant but simply chose not to is one that has been rejected by this court in no uncertain terms. For example in *Haddix*, we held as follows:

> [T]he United States urges us to interpret the inevitable discovery doctrine to admit evidence when the police could have obtained a warrant but did not do so — that is, whenever probable cause would have existed had a magistrate considered the question in advance of the search, regardless of whether a magistrate in fact did. Under such a theory, evidence that would constitute probable cause for a warrant, even when that evidence's existence is unknown to the police, is inherently destined to be "inevitably discovered." Let it be absolutely clear: this is untenable. As we have noted before, this position of the United States would "completely obviate the warrant requirement" and would constitute, to say the least, a "radical departure from the Fourth Amendment warrant requirement precedent."

*Haddix*, 239 F.3d 766, 768 (6th Cir. 2001) (quoting *Johnson*, 22 F.3d at 683-684); *see also United States v. Buchanan*, 904 F.2d 349, 357 (6th Cir. 1990) ("[P]olice who believe they have probable cause to search cannot enter a home without a warrant merely because they plan subsequently to get one. Any other view would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment.").

The cases that discuss this issue speak in terms of an initial illegal entry, in contrast to the situation here where the entry into the home was initially justified by the consent of an occupant, with subsequent revocation of the consent rendering the ongoing search and police presence in the home unlawful. There is no meaningful distinction between police entering a home unlawfully and police unlawfully overstaying their welcome in this context. Of course any evidence discovered during the consensual search would not be excluded. Even if such evidence itself gave rise to

probable cause, however, the existence of probable cause on its own is insufficient to continue the search merely because police *could* obtain a warrant yet choose not to do so under this Court's clear precedent. Absent specific exceptions not present here, the Fourth Amendment requires a search warrant, not probable cause coupled with the mere intent to get a search warrant. The majority's holding today renders the Fourth Amendment's warrant requirement toothless, and allows police to completely circumvent constitutionally guaranteed protections against unreasonable searches and seizures by after-the-fact justifications.

Accordingly, I would hold that the inevitable discovery doctrine should not apply and I would reverse Bowden's conviction based on the district court's erroneous denial of his motion to suppress.