NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0480n.06
Filed: June 8, 2005

No. 04-3834/3897

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RALPH L. GOLIDAY,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF
OHIO

_____/

Before:      MARTIN and ROGERS, Circuit Judges, and McKINLEY, District Judge.[*]

    BOYCE F. MARTIN, JR., Circuit Judge. On March 10, 2004, a jury found the defendant, Ralph Goliday, guilty of one count of possession with intent to distribute crack cocaine and one count of possession with intent to distribute powder cocaine, both in violation of 21 U.S.C. § 841(a)(1). On June 3, 2004, the district court sentenced the defendant to two-hundred-forty months imprisonment. Goliday appeals, arguing that the search that led to the discovery of the crack cocaine and powder cocaine violated his Fourth Amendment rights, and that a firearm and bullet-proof vest were improperly admitted into evidence at his trial. Goliday also argues that his sentence was unconstitutionally increased based on conduct not proved beyond a reasonable doubt in

_____

    [*]The Honorable Joseph H. McKinley, Jr. United States District Judge for the Western District of Kentucky, sitting by designation.

violation of the Sixth Amendment. For the following reasons we AFFIRM Goliday's conviction and sentence.

**I.**

Goliday was on probation and under supervision by the Trumbull County, Ohio, Adult Probation Department during the incident in this case. Vincent Peterson was his supervising probation officer. On the evening of August 22, 2002, Peterson received a call from Drug Enforcement Administration Agent Melanie Gambill, who informed him that Robert Boone was possibly located at Goliday's known residence. Boone was a probationer that Peterson's chief operations officer, Keith Evans, had asked Peterson to locate. Peterson then called another probation officer, Officer Miles, and the two of them arranged to meet and attempt to locate Boone at Goliday's residence. Peterson and Miles drove separately and met outside Goliday's residence. Peterson testified that while there were numerous cars located outside the residence, Boone's car was not among them. Peterson and Miles then decided to stop in to talk with Goliday, but first dropped Miles's car back at their office.

When they returned to Goliday's residence, Peterson and Miles got out of Peterson's car and approached the house. They knocked on the door and an individual answered and asked what they wanted. Peterson and Miles answered that they were there to see "Ralph" and were let into the house. The door opened directly into the kitchen, which is where the Peterson and Miles were standing when they viewed what appeared to be a clear plastic bag of marijuana sitting in plain view on top of a drier located in the kitchen. Peterson and Miles then walked into the living room, at which time Goliday streaked naked out of a bedroom and ran down the hallway into the bathroom.

Peterson then walked down the hallway, stood outside the bathroom door, and asked Goliday to get dressed and come out. Goliday agreed to come out and Peterson walked back out to the living room while Goliday went into the bedroom and got dressed.

While standing in the living room, Peterson and Miles saw, in plain view, a pellet gun. When Goliday entered the living room, Peterson stated that he and Miles wished to do a probation search based on their discovery of the marijuana and Goliday's naked run through the house. Goliday protested and repeatedly suggested that he and the probation officers discuss the matter outside. The officers told Goliday to sit down because they were going to search the house. While Goliday was then repeatedly insisting that he had to return to the bathroom first, a black female knocked on the front door. Peterson opened the door slightly and asked what she needed and she replied, "Let me get a 20." She then clarified to Peterson that she wanted a twenty-dollar rock of crack cocaine and Peterson told her to leave. Then another individual, who identified himself as Goliday's uncle, knocked on a side-door and told the officers that he was there to collect twenty dollars that Goliday owed him. When Peterson returned to the living room, Goliday continued to insist that he needed to use the bathroom. Peterson then decided to search the bathroom for drugs, and while engaged in a search he discovered what appeared to be chunks of rock cocaine in the toilet. Peterson scooped the rocks out of the toilet with a utensil he borrowed from the kitchen. He also noticed a green plate covered with what appeared to be a crack-like residue.

Peterson then returned to the living room, at which time a white female came to the door to purchase the apparently quite popular twenty-dollar rock of crack cocaine. After she was turned away, two white males came to the door also asking to purchase a twenty-dollar rock of crack

cocaine. Peterson then noticed that the man who identified himself as Goliday's uncle was peering through a little window in the living room demanding his twenty-dollars. Goliday told Peterson to "[t]ell that cat to get away from here" because he did not owe him any money. Peterson so instructed the man.

Due to all of the activity at the residence, Peterson then decided to call Agent Gambill and requested assistance. Peterson suspended the probation search while waiting for Gambill to arrive because of his concern over the number of people approaching the house. Approximately thirty minutes later Gambill arrived along with Detective Weber, and the four officers engaged in a full search of the house. During this search they discovered additional crack cocaine, powder cocaine, a handgun, and a bullet-proof vest. The drugs seized led to the indictment in this case. The district court denied Goliday's motion to suppress the evidence and Goliday was convicted after a jury trial. The court then sentenced Goliday to two-hundred-forty months for the crack cocaine conviction and two-hundred-thirty-five months for the powder cocaine conviction, the sentences to be served concurrently.

## II.

### A. Motion to Suppress

We review a district court's factual findings underlying its denial of a motion to suppress for clear error and its conclusions of law *de novo*. *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000). Because we find no error in the district court's judgment, we affirm its denial of Goliday's motion to suppress the evidence obtained during the probation search.

In *Griffin v. Wisconsin*, the Supreme Court made clear that a state may provide for searches of parolees and their property without a warrant and based on less than probable cause. 483 U.S. 868, 873 (1987). Probation officers must have at least reasonable suspicion that the parolee is not abiding by the law. *United States v. Payne*, 181 F.3d 781, 787-88 (6th Cir. 1999). The special needs of the parole system justify this lesser standard and potential parolees who do not want to be subject to these searches have the choice of remaining incarcerated. Ohio law provides for probation searches based upon reasonable suspicion and is thus consistent with the Fourth Amendment. *See* Ohio Rev. Code § 2951.02(C)(2).[1]

The district court found that Peterson had reasonable suspicion to search the residence upon noticing the suspected marijuana in plain view coupled with Goliday's naked dash through the house and subsequent suspicious behavior. Goliday does not seem to dispute that reasonable suspicion existed; rather, he argues that Agent Gambill's and Detective Weber's warrantless search violated his Fourth Amendment rights, and further that Peterson and Miles acted as a "stalking horse" for the police officers — that is, the probation officers used their ability to search based on less than probable cause to gather evidence for Gambill, who could not otherwise obtain it because she lacked probable cause for a search.

---

[1]The statute in effect at the time provided: "During the period of a misdemeanor offender's probation . . . authorized probation officers who are engaged within the scope of their supervisory duties or responsibilities may search . . . without a warrant, the person of the offender, the place of residence of the offender, and a motor vehicle . . . if the probation officers have reasonable grounds to believe that the offender is not abiding by the law or otherwise is not complying with the conditions of the offender's probation." Ohio Rev. Code § 2951.02(C)(2) (2001).

We agree with the district court that the circumstances provided reasonable suspicion for the probation officers to conduct a search of Goliday's residence. As Goliday does not seem to dispute the district court's finding, we decline to analyze this issue any further. We also agree with the district court's conclusion that Goliday failed to demonstrate that the probation officers' search was a ruse to gain access to Goliday's residence on behalf of Gambill or Weber. Searches conducted by probation officers who act as "stalking horse[s]" for police, in effect abusing their authority and circumventing the warrant requirement of the Fourth Amendment, may be unlawful. *See United States v. Russ*, 23 Fed. Appx. 245, 2001 WL 1136127 (6th Cir. 2001) (unpublished); *United States v. Grimes*, 225 F.3d 254, 259 (2d Cir. 2000); *United States v. McFarland*, 116 F.3d 316, 318 (8th Cir. 1997); *United States v. Ooley*, 116 F.3d 370, 372 (9th Cir. 1997); *United States v. McCarty*, 82 F.3d 943, 947 (10th Cir. 1996). *But see United States v. Knights*, 534 U.S. 112, 121-22 (2001). Probation officers and police officers nevertheless may work together in conducting a search provided that the parole officer is pursuing parole-related objectives. *Russ*, 23 Fed. Appx. at 247 (citing *McFarland*, 116 F.3d at 318). That is, for purposes of Ohio law, the probation officer must be "engaged within the scope of [his or her] supervisory duties or responsibilities" and has "reasonable grounds to believe that the offender is not abiding by the law or otherwise is not complying the conditions of the offender's probation." Ohio Rev. Code § 2951.02(C)(2).

We agree with the district court that there is no evidence Peterson and Miles acted as "stalking horse[s]" for Agent Gambill or Detective Weber. The only reason Peterson and Miles went to Goliday's residence in the first place was because they were looking for Boone, another probationer. After viewing numerous cars and persons at Goliday's residence, the probation officers

decided to stop in and speak with Goliday. They were allowed access to the house, via the kitchen, where the observed what they believed to be was a bag of marijuana, followed by Goliday's naked sprint through the house. Before conducting any search, the officers met with Goliday in the living room. During this time, a woman came to the door attempting to buy crack and a man came to the door demanding money from Goliday. Only then did the officers begin their search and discovery of additional crack cocaine. The search was continually interrupted by additional individuals attempting to purchase drugs from Goliday, and only then — concerned for their safety and ability to conduct the search — did the probation officers contact Agent Gambill to ask for assistance. Based on these circumstances, we see no evidence that the probation officers' search was a ruse conducted at the behest of or for the benefit of Agent Gambill or Detective Weber. We affirm the district court's denial of Goliday's motion to suppress.

## B. Admission of Firearm and Bullet-Proof Vest

Goliday also argues that the admission of the firearm and bullet-proof vest over his objection was erroneous. We review a district court's decision to admit evidence pursuant to Federal Rule of Evidence 403 for abuse of discretion. *United States v. Henley*, 360 F.3d 509, 518 (6th Cir. 2004). Relevant evidence, that is, evidence having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," Fed. R. Evid. 401, is made generally admissible by Federal Rule of Evidence 402. A district court, however, may exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Fed. R. Evid. 403. We will reverse a district court's decision to admit relevant evidence only if it was an abuse of discretion and the error was not harmless. *Diamond v. Howd*, 288 F.3d 932, 934 (6th Cir. 2002).

We have long recognized firearms and ammunition as tools of the drug trafficking trade and have consistently concluded that a district court does not abuse its discretion by admitting such evidence when it is related to the crime charged. *United States v. Arnott*, 704 F.2d 322, 325-26 (6th Cir. 1983). We have, however, held that when a defendant is not charged with a firearms violation and a firearm is not relevant to the crimes charged, a district court abuses its discretion in admitting the firearm. *See e.g.*, *Brubaker v. United States*, 183 F.2d 894, 898 (6th Cir. 1950) (holding that "the presence of the revolvers in his suitcase had no bearing whatsoever upon the charge of receiving the stolen car"). Nonetheless, we have recognized that "dealers in narcotics are well known to be dangerous criminals usually carrying weapons," *United States v. Korman*, 614 F.2d 541, 546 (6th Cir. 1980), and in the words of the Second Circuit, "[e]xperience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment," *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976).

Goliday was discovered with a substantial amount of crack cocaine and powder cocaine, and the officers observed numerous individuals attempt to purchase narcotics from Goliday. Additionally, the handgun and ammunition in this case was found in the northwest bedroom of Goliday's residence along with the cocaine and two pit-bull dogs standing guard. Under these

circumstances, we find that the district court did not abuse its discretion in admitting the handgun, ammunition, and bullet-proof vest as evidence of Goliday's intent to engage in the drug trade.

### III.

Finally, Goliday argues that he was unconstitutionally sentenced based upon the principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Specifically, Goliday argues that the district court improperly increased his base offense level two points because it found that a handgun was present during the commission of the crime of possession of crack cocaine with the intent to distribute. The Supreme Court in *United States v. Booker*, 125 S. Ct. 738 (2005), concluded that the Sixth Amendment, as construed in *Blakely*, does apply to the federal sentencing guidelines. Thus, "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. This Court, and all other circuits to have addressed the issue, however, have concluded that *Booker* does not compel resentencing when the defendant receives the statutorily prescribed mandatory minimum sentence. *United States v. Joiner*, 123 Fed. Appx. 681, 2005 WL 351152 (6th Cir. 2005) (unpublished); *United States v. Painter*, 400 F.3d 1111, 1111 (8th Cir. 2005); *United States v. Moore*, 401 F.3d 1220, 1222 n. 1 (10th Cir. 2005); *United States v. Antonakopoulos*, 399 F.3d 68, 75 (1st Cir. 2005) ("A mandatory minimum sentence imposed as required by a statute based on facts found by a jury or admitted by a defendant is not a candidate for *Booker* error."); *United States v. Sharpley*, 399 F.3d 123, 127 (2d Cir. 2005) (finding harmless error when a calculated guidelines sentence was less than the statutory minimum and the district court gave the statutory minimum).

On count one, Goliday received a statutorily prescribed mandatory minimum sentence of twenty years (or two-hundred-forty months). *See* 21 U.S.C. § 841(a)(1). On count two, he received a Guidelines sentence of two-hundred-thirty-five months. The two point enhancement for the possession of the firearm increased Goliday's sentencing range from a range of one-hundred-fifty-one to one-hundred-eighty-eight months to a range of one-hundred-eighty-eight months to two-hundred-thirty-five months, and thus, violated his Sixth Amendment rights. Because the district court imposed the sentences on the two counts to run concurrently, however, resentencing on count two is not necessary — Goliday will serve two-hundred forty months in prison regardless of any Sixth Amendment violation on count two. We therefore decline to remand for resentencing.

## IV.

For the foregoing reasons, we affirm Goliday's conviction and sentence.