NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0414n.06

Case No. 22-1104

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 26, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| CRAIG JAMES MARR, | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | OPINION |

Before: GRIFFIN, STRANCH, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. While Craig Marr was on parole for a state murder conviction, a police officer received a tip that he had illegal drugs and a gun. Based on the tip, authorities stopped Marr's vehicle and searched him. They found a loaded pistol in his waistband, after which Marr admitted that he also had another loaded magazine and a bag of drugs on his person. Officers retrieved the loaded magazine at the scene and, after arresting Marr and transporting him to jail, retrieved a baggie of methamphetamine from his underwear. The arrest led to an indictment charging Marr with being a felon in possession of a firearm, as well as possession with intent to distribute methamphetamine and possession of a firearm in furtherance of a drug-trafficking crime.

Before trial, Marr moved to suppress the gun, ammunition, and drugs, claiming that both the stop and the search violated his rights under the Fourth Amendment. He also filed motions seeking to preclude a government agent from offering opinion testimony about the drug trade. The district court denied both pretrial motions. And a jury later convicted Marr on all three counts. He

now appeals, renewing his challenges to the search and seizure and to the admission of the agent's opinion testimony. He also claims that the government's evidence at trial was insufficient for a jury to convict him of possession with intent to distribute and possession of a firearm in furtherance of drug trafficking.

Because the officers' stop and search of Marr was reasonable under the totality of the circumstances, the district court reasonably found that the agent's anticipated testimony would help the jury, and sufficient evidence supports Marr's convictions, we AFFIRM the district court's judgment.

I.

After serving 20 years in state prison for a second-degree-murder he committed as a teenager, Marr was released on parole in September 2020. Following his release, Marr returned to his hometown of Lansing, Michigan. About seven months later, in April of 2021, a confidential informant ("CI") advised John Cosme, a Lansing police officer, that Marr was selling drugs and was often seen with a firearm. The CI also told Cosme that Marr was on parole, which Cosme verified. After this initial contact from the CI, but before Marr's arrest in this case, Cosme stopped Marr for a traffic violation. During this initial stop, Marr also informed Cosme that he was on parole.

Subsequently, in the late hours of April 27 or the early hours of April 28, 2021, the same CI called Cosme and told him that he had seen Marr with a firearm and methamphetamine. Cosme and at least one other Lansing police officer followed up by traveling in unmarked vehicles to the location provided by the CI. The officers saw Marr get into his car and start driving. "Based on the information" and "the parole history," the officers decided to conduct "a dynamic contact,"

i.e., block Marr's vehicle so he could not flee. (R. 30, Suppression Hrg. Tr., PageID.106.) Police officers and Michigan State Police troopers effectuated the stop.

A state trooper searched Marr and found a loaded handgun tucked in his waistband. After placing Marr in a patrol car, the trooper asked Marr if he had anything else on him. Marr confessed to having a magazine for a firearm in his pants, which the trooper recovered, and a "little bag of dope." Once Marr was taken to jail, authorities discovered a baggie hidden between layers of his clothing; the baggie contained 21.5 grams of crystal methamphetamine.

In May 2021, a federal grand jury indicted Marr on three counts: (1) felon in possession of a firearm, (2) possession with intent to distribute methamphetamine, and (3) possession of a firearm in furtherance of a drug trafficking crime.

Marr filed two pretrial motions relevant to this appeal. First, he moved to suppress the firearm, magazine, and methamphetamine on the grounds that the search and seizure violated the Fourth Amendment. The district court, primarily relying on a condition in Marr's parole order that permitted "peace officer[s]" to search him "upon demand" and relevant case law, found that the officers' search of Marr did not violate the Fourth Amendment. Marr also filed a motion to exclude the opinion testimony of DEA Special Agent Melissa Kazik under Federal Rules of Evidence 702 and 403. Marr contended that Kazik's anticipated testimony about the cash-based and violent nature of the drug trade, including the use of firearms, would not be helpful to the jurors because such information is common knowledge. The district court disagreed and permitted Kazik to testify.

At trial, Marr's defense was that he carried the firearm for self-protection and that the methamphetamine he possessed was for personal use. But Kazik and a Lansing police officer opined that 21.5 grams of methamphetamine was not consistent with personal use. Kazik also

testified that drug users, as opposed to drug dealers, would typically sell a firearm or trade it for additional drugs. In the end, the jury convicted Marr of all three counts.

## II.

On appeal, Marr raises three claims of error. First, he says that the district court erred in denying his motion to suppress. Second, he asserts that the district court abused its discretion in permitting Kazik to testify about drug trafficking. Third, he argues that there was insufficient evidence for a jury to convict him of possession with intent to distribute methamphetamine or possession of a firearm in furtherance of that drug-trafficking crime.

We address these arguments in turn.

## A.

"In reviewing the denial of a motion to suppress, we review legal questions de novo and the district court's factual findings for clear error." *United States v. Sharp*, 40 F.4th 749, 752 (6th Cir. 2022) (quoting *United States v. Cooper*, 24 F.4th 1086, 1090–91 (6th Cir. 2022)). And we view the evidence in the light most favorable to the government. *Id.*

*Fourth Amendment Search and Seizure.* Marr argues that the police officers stopped and searched him without reasonable suspicion of the commission of a crime and without knowledge of his parole search condition. Marr does not dispute that in his parole order, he agreed to "on demand" searches by police officers. But he argues that Officer Cosme was not aware of that parole condition before authorities stopped and searched him, so the parole condition did not render their search and seizure reasonable under the Fourth Amendment.

Regardless of whether Cosme was aware of the search condition prior to conducting the traffic stop, the district court did not err in denying Marr's motion to suppress. We thus find it unnecessary to address the broader question of whether the existence of the parole condition alone

sufficed to justify the search. This is because under the totality of circumstances, both the stop and the search were reasonable under the Fourth Amendment.

"Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." *United States v. Knights*, 534 U.S. 112, 121 (2001). Due to his status as a parolee, Marr's liberty was restricted. And even if Cosme did not know of Marr's search condition, he certainly knew Marr was a parolee. So instead of the typical probable-cause analysis, we employ the totality-of-circumstances approach here. *See United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008) ("[T]he warrant and probable cause requirements generally do not apply to searches of parolees, probationers or their residences."). Under this approach, we "assess[], on the one hand, the degree to which" the search intruded upon Marr's privacy "and, on the other, the degree to which [the search was] needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quoting *Knights*, 534 U.S. at 119).

First consider Michigan's legitimate interests. "[A] State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* at 853 ("[A] State has an 'overwhelming interest' in supervising parolees because 'parolees . . . are more likely to commit future criminal offenses.'" (quoting *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 365 (1998)). Without question, Michigan had an interest in supervising Marr, specifically. To begin, Cosme knew that Marr was a parolee for a homicide. Further, a CI who had (1) completed the Lansing Police Department's credibility protocol, (2) provided the Department with reliable information in the past, (3) provided specific information about Marr that

Cosme had corroborated, and (4) twice informed Cosme that he had seen Marr with a firearm and crystal methamphetamine—most recently, on the day of the stop.  As Cosme explained, "[b]ased on the information, based on the parole history, we decided to do a dynamic contact, which means blocking the vehicle from having the opportunity to flee."  (R. 30, Suppression Hrg. Tr., PageID.106.)

On the other side of the scale, Marr's expectation of privacy was "severely diminished." *Samson*, 547 U.S. at 852.  In *Samson*, the Supreme Court noted that California parolees' liberty can be restricted not only by the suspicionless search condition at issue in that case but also in several other ways, including "mandatory drug tests, restrictions on association with felons or gang members," "mandatory meetings with parole officers," employment updates, limits on travel, and restrictions on the possession of weapons.  *Id.* at 851–52.  "The extent and reach of these conditions," the Supreme Court explained, "clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone." *Id.* at 852.  Marr was subject to similar parole conditions: he had to comply with drug testing as ordered by his parole officer, he could not associate with people with a felony conviction, he had to meet with his parole officer, he could not change employment without permission from his parole officer, he could not travel outside of Michigan without permission, and he could not possess a firearm or use any object as a weapon.  Thus, Marr had a "severely diminished expectation[] of privacy by virtue of [his] status [as a parolee] alone." *Id.*

On balance, the officers' search of Marr was not an unreasonable search or seizure prohibited by the Fourth Amendment—even if Cosme was unaware of Marr's on-demand search condition.

In resisting this result, Marr suggests that this is a "reverse stalking horse" scenario. In a traditional stalking-horse scenario, police use a parole officer's authority to conduct a search to circumvent the warrant requirement and further their own investigation. *See United States v. Goliday*, 145 F. App'x 502, 505 (6th Cir. 2005) (collecting cases). Marr's argument is not entirely clear, but to the extent he contends that this is a reverse stalking horse scenario because the police (as opposed to the parole agent) conducted the search using Marr's parole conditions it fails.

There was no subterfuge here. As explained, irrespective of whether Cosme knew about the search condition, the record clearly shows that he was aware of Marr's parole status and possessed concerning information from a reliable CI that Marr possessed narcotics and a gun— items which are illegal for parolees to possess. The authorities therefore did not use any type of subterfuge to stop and search Marr and this argument does not undermine our conclusion that the search was reasonable under the totality of the circumstances.

In sum, we affirm the district court's denial of Marr's motion to suppress.

B.

*Use of Opinion Testimony.* Relying primarily on Federal Rule of Evidence 702(a), Marr also claims that the district court erred in permitting DEA Special Agent Melissa Kazik to offer opinion testimony about drug trafficking and the use of firearms by drug dealers. Under Rule 702(a), "[a] district court may commit manifest error" by admitting expert opinion testimony that is within "the ken of the average juror." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)). In Marr's view, jurors already know the basics of the drug trade thanks to its depictions in pop culture. He further

contends that it is common sense that people do not write checks to buy drugs and that dealers protect their inventory with guns.

"We review for abuse of discretion the district court's determination to admit or exclude expert testimony." *Id.* at 413 (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008)).

The district court was within its discretion in permitting Kazik to testify that the amount of methamphetamine Marr possessed was more consistent with drug dealing than personal use. At the final pretrial conference, Marr indicated to the district court that he would attempt to persuade the jury that he possessed only a user-level amount of methamphetamine. Yet he did not direct the district court's attention to any evidence demonstrating that the average juror would know whether 21.5 grams of methamphetamine is a personal-use or a dealer amount. Considering Marr's anticipated defense at trial, therefore, the district court reasonably concluded that Kazik would be allowed to testify about "intent to distribute amounts, user amounts, etcetera." (R. 52, Final Pretrial Hrg. Tr., PageID.335.) Officer testimony on the characteristics of criminal activity is allowable if it will help the trier of fact to understand the evidence and "appropriate cautionary instructions are given." *United States v. Swafford,* 385 F.3d 1026, 1030 (6th Cir. 2004) (quoting *United States v. Thomas,* 99 F. App'x 665, 668–69 (6th Cir. 2004)). In keeping with that principle, we have "routinely allow[ed] qualified law enforcement officials to testify that circumstances are consistent with drug distribution rather than personal use." *United States v. Ham*, 628 F.3d 801, 805 (6th Cir. 2011) (quoting *United States v. Alford*, 332 F. App'x 275, 282 (6th Cir. 2009)). The district court, therefore, did not err in permitting this testimony.

As for Kazik's testimony about the connection between firearms and drug trafficking, we have likewise indicated that this type of testimony is helpful to a jury. In *Swafford*, we held that

it was not plain error for an agent to testify that "drug dealers carry firearms for intimidation and protection of their product." 385 F.3d at1030. In doing so, we noted that most courts had "taken a very tolerant view of the admissibility of expert testimony linking the presence of firearms to drug trafficking activities." *Id.* (quoting *United States v. Thomas*, 99 F. App'x 665, 669 (6th Cir. 2004)). We recently reached the same conclusion in *United States v. Simpson*, 845 F. App'x 403, 410 (6th Cir. 2021).

Marr acknowledges this precedent but argues that *Swanson* is outdated and that *Simpson* is distinguishable. He points out that in *Simpson*, unlike here, the gun was not found on the defendant's person, so opinion testimony linking the gun and drugs was helpful to the jury. And he suggests that the age of the *Swanson* decision weakens its persuasive value here; noting that it is over a decade old, he posits that "in the age of the internet and reality TV" the knowledge of would-be jurors advances at "supersonic speed." (Appellant's Br. at 26.)

Perhaps Marr is correct that these days, many potential jurors know that drug traffickers use guns. But that is not our call to make in the first instance. And here—although not directly referring to Kazik's potential testimony about firearms—the district court explained that drug trafficking protocols are not "within the normal parlance of an average juror." (R. 52, Final Pretrial Hrg. Tr., PageID.335.) Even if that determination is debatable, it was not an abuse of discretion.

That said, it is reasonable to question whether the government offered enough details for the district court to make an informed ruling about how helpful Kazik's anticipated testimony would be. In responding to Marr's motion in limine to exclude Kazik's testimony, the government essentially told the district court that Kazik would testify that guns are tools of the trade for drug traffickers. That rudimentary information is not very helpful to a jury.

But any error at the motion in limine stage proved harmless. *See United States v. Hunt*, 63 F.4th 1229, 1244–45, 1249 (10th Cir. 2023) (finding that even if the district court erred when ruling on a pretrial motion to exclude expert testimony, reversal was not required because, given the expert's trial testimony, the error was harmless). At trial, Kazik did not merely tell the jury that drug traffickers use guns. She also informed the jury that if a drug user obtained a firearm, he or she typically would sell, pawn, or trade it for drugs, whereas drug dealers would use firearms to protect themselves, their drugs, and their drug proceeds. By contrasting how drug users and drug dealers use guns, Kazik went beyond the basics and offered testimony that helped the jury "understand the evidence" or "determine a fact in issue." Fed. R. Evid. 702(a).

Two of Marr's counterarguments warrant brief discussion. First, Marr says our precedents establish that the connection between guns and drug trafficking is nuanced and implies that opinion testimony is only helpful if it is similarly nuanced. But the cases Marr cites do not address the issue before us: what type of testimony aids a jury's understanding of how firearms are used in the drug trade. *Cf. United States v. Jackson*, 877 F.3d 231, 234, 237 (6th Cir. 2017) (describing factors that bear on whether a firearm was used "in connection with" a felony for purposes of a sentencing enhancement); *United States v. Shields*, 664 F.3d 1040, 1044–45 (6th Cir. 2011) (same); *United States v. McKenzie*, 410 F. App'x 943, 945–46 (6th Cir. 2011) (same); *United States v. Ray*, 803 F.3d 244, 263 (6th Cir. 2015) (describing factors that bear on whether there is sufficient evidence to support that a firearm was used "in furtherance of" a drug-trafficking crime). To the extent that these cases suggest arguments by analogy, as explained, Kazik's testimony about firearms and drug trafficking turned out to be sufficiently nuanced.

Next, Marr argues that Kazik simply presented the government's theory of the case under the guise of expert testimony. We disagree. As an initial matter, the cases Marr cites illustrating

this improper use of expert testimony are not like this one. In *Rios*, we noted that by permitting testimony from a government expert, the district court "ran the risk" that the expert would "transform into the hub of the case," connecting the government's evidence to create a coherent picture for the jury. 830 F.3d at 416 (citation and brackets omitted). But the agent in *Rios* strayed from testifying based on his expertise and personal investigation into testifying about specific criminal acts of the defendants' gang. *Id.* at 415–16. In contrast, Kazik testified about drug trafficking in the abstract and she expressly stated that she knew nothing about Marr in particular. As for the other case that Marr cites, *United States v. Freeman*, the government's expert there "effectively spoon-fed . . . the government's theory of the case to the jury" by providing inculpatory interpretations of phone calls that jurors were competent to interpret on their own. 730 F.3d 590, 597–98 (6th Cir. 2013). Conversely, Kazik testified about dealer versus user quantities of methamphetamine and differences between dealers and users in gun usage—information that would help many jurors to better understand the evidence and facts at issue in the case.

In short, we find that the district court did not reversibly err in permitting Kazik's opinion testimony.

## C.

*Sufficiency of the Evidence.* Marr's final claim of error is that the evidence was insufficient for a jury to convict him of counts two and three of the indictment.

To win reversal on this theory, Marr must clear a high bar. We view the "evidence in the light most favorable to the prosecution" and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In conducting this limited review, we do not "intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from

basic facts to ultimate facts.'" *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quoting *Jackson*, 443 U.S. at 319).

To convict Marr on count two, the jury had to find that Marr knowingly or intentionally possessed with intent to distribute at least 5 grams of methamphetamine. 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii).

Marr does not dispute that he knowingly possessed 21.5 grams of methamphetamine, but he argues that no rational juror could find, beyond a reasonable doubt, that he had the intent to distribute it. For support, Marr points to evidence that he was a user. For instance, Marr's parole officer testified that within a few months of being released from prison, Marr had tested positive for methamphetamine three times. He also points out that, when he was arrested, officers found no scales, cash, packing materials, or cell phone. Kazik acknowledged that these are typical tools used by drug dealers. Finally, Marr directs our attention to a note from the jury regarding the possession-with-intent-to-distribute charge. The jury stated, "We cannot reach a unanimous agreement on Count 2A. Are we therefore required to check the 'not guilty' box?" (R. 50, Jury Verdict, PageID.321). From Marr's perspective, the jurors' question showed that they "seemed poised to acquit." (Appellant Br. at 33.)

Even taking the evidence Marr highlights into consideration, *Jackson*'s high bar is not satisfied. Robert Forbis, a police officer, testified that drug users typically purchase one half to one gram of methamphetamine at a time and that it would be "extremely unusual" for someone buying a gram at a time to be in possession of 21 grams. (R. 71, Trial Tr., PageID.616). Kazik likewise testified that a drug user would buy about a gram at a time and that typically, drug users do not have relationships with their suppliers such that they can purchase a quantity as large as 21.5 grams. A rational juror could credit Forbis's and Kazik's testimony. And if a rational juror

did so, she could reasonably find that Marr possessed methamphetamine with the intent to distribute it.

That leaves Marr's challenge to his conviction on count three of the indictment, the 18 U.S.C. § 924(c) charge. A conviction under § 924(c) is warranted if a jury finds that a defendant possessed a firearm "in furtherance of" a drug-trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A). This court often considers six factors in deciding whether the evidence supports an in-furtherance conviction: whether the firearm was "strategically located so that it is quickly and easily available for use . . . whether the gun was loaded, the type of weapon, the legality of its possession, the type of drug activity conducted, and the time and circumstances under which the firearm was found." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). With the possible exception of the first factor (strategic location), these are not requirements that must be satisfied. *See United States v. Maya*, 966 F.3d 493, 501–02 (6th Cir. 2020). Nor are they an exhaustive list of in-furtherance considerations. *Mackey*, 265 F.3d at 462.

Marr concedes that he possessed a firearm but argues that no rational juror could convict him of possessing it in furtherance of drug trafficking. On this front, Marr couples what he views as scant evidence of drug trafficking with the fact that he was arrested in a high-crime area.

But this analysis falls short of *Jackson*'s standard. As discussed, based on Forbis's and Kazik's testimony about the quantity of methamphetamine Marr possessed, a rational juror could find that Marr was engaged in drug trafficking. As for whether the firearm was possessed in furtherance of that crime, many of the *Mackey* factors cut in favor of the conviction. The firearm was found in Marr's waistband, it was loaded, and an additional, loaded magazine was also on Marr's person. The drugs likewise were found on Marr's person. So the guns and drugs were near each other, with the gun "quickly and easily available for use." *Id.* Finally, Marr's prior felony

conviction and parole status made it illegal for him to possess a firearm.  *See Ray*, 803 F.3d at 264.

Taking the evidence in the light most favorable to the government as we must, a rational juror could find beyond a reasonable doubt that Marr possessed a firearm "in furtherance of" possession with the intent to distribute methamphetamine.

In sum, sufficient evidence supports Marr's convictions of counts two and three.

III.

For the reasons discussed, we AFFIRM the district court's judgment.