RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0023p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TAURUS COOPER,

*Defendant-Appellant*.

No. 21-5209

─────────────

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:19-cr-20339-1—Thomas L. Parker, District Judge.

Argued: October 20, 2021

Decided and Filed: February 3, 2022

Before: BATCHELDER, LARSEN, and READLER, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Michael J. Stengel, MICHAEL J. STENGEL, P.C., Memphis, Tennessee, for Appellant. Naya Bedini, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee. **ON BRIEF:** Michael J. Stengel, MICHAEL J. STENGEL, P.C., Memphis, Tennessee, for Appellant. Naya Bedini, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

─────────────

## OPINION

─────────────

LARSEN, Circuit Judge.  Taurus Cooper pleaded guilty to possessing a firearm as a felon, 18 U.S.C. § 922(g), but reserved the right to appeal the denial of his motion to suppress the gun underlying the charge.  On appeal, Cooper contends that the district court erred in applying the inevitable discovery exception to the exclusionary rule.  Because the district court

focused on the wrong legal test, we VACATE the district court's judgment and REMAND for further proceedings.

I.

Several law enforcement agencies executed a warrant for Cooper's arrest on suspicion of firearms and narcotics charges. Among them was the Shelby County Sheriff's Department Fugitive Apprehension Team, which had been called in to assist. At a pre-arrest meeting, the Team learned that Cooper was known to be a high-ranking gang member; and the Team was shown a Facebook photo of Cooper holding a Glock handgun with a fully loaded high-capacity magazine. Officers from the Team and other police agencies traveled to the home of Cooper's girlfriend, Angel Walton, where they expected to find Cooper.

When Officer Joshua Fox knocked on the door, Walton answered. Through the doorway, Fox saw Cooper sitting on the living room couch. Concerned about spooking Cooper into fleeing, Fox showed Walton a photograph of another individual (someone he knew was not at Walton's home) and asked if that person was there. Walton, as expected, said "no." Fox nonetheless asked whether he could come inside to look for the individual, and, according to Fox's later testimony, Walton agreed.[1] Fox proceeded to arrest Cooper while the rest of the officers—at least five more—rushed into the home and spread out to conduct a protective sweep. Aiming to discover any armed confederates who might ambush them, the officers swiftly checked each room of the house, "wherever a body c[ould] hide." Jeffrey Jensen, the officer checking the back bedroom, noticed a lump in the mattress, flipped it over, and discovered the Glock handgun depicted in Cooper's Facebook post.

As soon as Jensen called out his discovery, Fox retrieved rights-waiver and consent-to-search forms from his vehicle. He went over both with Walton. The first form listed Walton's *Miranda* rights and included spaces to fill in information about the recently found firearm; the second asked whether Walton consented to a search of her home. Walton placed her initials next to lines stating that she was consenting freely, that she had not been threatened or coerced, and

---

[1]Walton testified that she never consented to officers entering her home to look for the faux suspect, but the district court found her testimony incredible and credited Fox's version of events instead. We defer to that credibility finding. *See United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003).

that she had been treated fairly.  With Walton's consent, officers conducted a more thorough search but recovered only a hat matching the one Cooper had been wearing in his Facebook photo.

Charged with possessing a firearm as a felon, 18 U.S.C. § 922(g), Cooper moved to suppress the gun seized during the sweep of Walton's house.  The district court held an evidentiary hearing at which Fox, Jensen, and Walton testified.  Their testimony focused primarily on the protective sweep and consent form, with little discussion of the situation before the sweep.  The court denied Cooper's motion.  Although the court concluded that the protective sweep was unlawful, the court determined that Walton's subsequent consent was voluntary, that her consent was sufficiently attenuated from the illegal sweep, and that officers inevitably would have discovered the gun in the lawful consent search.  Cooper pleaded guilty, reserving the right to appeal the suppression ruling.  He was sentenced to 77 months' imprisonment.

## II.

In reviewing the denial of a motion to suppress, we review legal questions de novo and the district court's factual findings for clear error.  *United States v. Abdalla*, 972 F.3d 838, 844 (6th Cir. 2020).  The government does not challenge the district court's holding that the protective sweep violated the Fourth Amendment.  That means the gun, the primary fruit of an unlawful search, must be suppressed unless an exception to the exclusionary rule applies.  *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016).  The only relevant exception is inevitable discovery. The case turns, therefore, on whether the district court properly applied that exception.

## A.

"[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source."  *Id.*  The doctrine flows from the deterrence goals underpinning the exclusionary rule itself:  If the same evidence surely would have been found without the illegality, "then the deterrence rationale has so little basis that the evidence should be received."  *Nix v. Williams*, 467 U.S. 431, 444 (1984).  In short, this exception ensures that the exclusionary rule puts police in the same position they would have been in without the illegality, not a worse one.  *Murray v. United States*, 487 U.S. 533, 541

(1988).  The government bears the burden of showing that the exception applies.  *Nix*, 467 U.S. at 444; *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008).

Our cases recognize two scenarios in which inevitable discovery operates.  First, the doctrine applies when there is "an independent, untainted investigation" that was bound to uncover the same evidence.  *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995).  *Nix*, for example, involved two parallel, independent efforts to locate a victim's corpse:  an interrogation by detectives and a volunteer grid search.  467 U.S. at 435–37.  No one argues that this first category applies here, where the same group of officers conducted a single investigation, so we focus on the second.  Inevitable discovery also applies when "other compelling facts" demonstrate that discovery was inevitable.  *Kennedy*, 61 F.3d at 499.  A few paradigmatic examples of "other compelling facts" demonstrate what we mean.  The doctrine applies when the evidence would have been discovered pursuant to a "routine procedure," such as an airline's standard policy of opening lost luggage.  *Id.* at 500.  And it has repeatedly been employed when, after seizing evidence during an illegal search, police obtain and execute a search warrant based on probable cause developed before the illegal search.  *E.g.*, *United States v. Bowden*, 240 F. App'x 56, 61 (6th Cir. 2007); *United States v. Keszthelyi*, 308 F.3d 557, 573–75 (6th Cir. 2002).  As long as the "evidence discovered during [the] illegal search would have been discovered during a later legal search[,] and the second search inevitably would have occurred in the absence of the first," then the evidence may be admitted.  *Keszthelyi*, 308 F.3d at 574.

The government argues, and the district court agreed, that Cooper's gun should not be suppressed because it inevitably would have been found in the ensuing consent search.  In attempting to prove that claim, the government focuses exclusively on whether Walton's consent was voluntary and untainted by the illegal sweep.  The district court largely adopted that same framework, invoking the "attenuation" factors used to assess whether a statement acquired as a product of illegality is "sufficiently an act of free will to purge the primary taint."  *Brown v. Illinois*, 422 U.S. 590, 602 (1975) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).  But the attenuation doctrine laid out in *Brown* and *Wong Sun* is distinct from the inevitable discovery exception.  Before addressing how the inevitable discovery rule applies here, some housekeeping is in order.

Start with the basics. The exclusionary rule prohibits introduction of evidence directly acquired by an unlawful search or seizure, as well as "derivative evidence, both tangible and testimonial, that is the product of the primary evidence." *Murray*, 487 U.S. at 536–37. In assessing whether illegally seized evidence should be suppressed, but-for causation is a necessary, but not sufficient condition. *Hudson v. Michigan*, 547 U.S. 586, 592 (2006); *United States v. Elmore*, 18 F.4th 193, 202 (6th Cir. 2021). Both inevitable discovery and attenuation "involve the causal relationship between the unconstitutional act and the discovery of evidence." *Strieff*, 136 S. Ct. at 2061. But importantly, the two doctrines test different aspects of the causal chain.

Under the inevitable discovery doctrine, if the evidence would have been lawfully discovered without the unconstitutional source, then it should be admitted. *Id.* That test necessarily involves some hypothesizing. We must ask: "[V]iewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred[?]" *Kennedy*, 61 F.3d at 498 (quoting *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)); *see also Murray*, 487 U.S. at 542 n.3 ("To determine whether the warrant was independent of the illegal entry, one must ask whether it would have been sought even if what actually happened had not occurred . . . .").

The attenuation doctrine, by contrast, tests something akin to proximate cause: whether the causal link has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939). A finding of attenuation does not mean that but-for causation is lacking. *See Hudson*, 547 U.S. at 592 ("[B]ut-for cause, or 'causation in the logical sense alone,' can be too attenuated to justify exclusion." (quoting *United States v. Ceccolini*, 435 U.S. 268, 274 (1978))). *Wong Sun*, the seminal attenuation case, made that clear by holding that a defendant's confession was admissible even though police would never have located the defendant but-for an earlier illegal arrest. 371 U.S. at 491; *see also Elmore*, 18 F.4th at 202 (holding that evidence sufficiently attenuated from illegal searches should not be suppressed even though searches may have been a but-for cause of obtaining the evidence); *United States v. Castillo*, 238 F.3d 424, 2000 WL 1800481, at *5–6 (6th Cir. 2000) (table) (fleeing from arrest

"in response to police misconduct" is an "intervening event" sufficient to purge the taint of the stop (quotation marks omitted)).

The two exceptions also serve different goals. In most cases, the attenuation doctrine, unlike inevitable discovery, is not intended to restore law enforcement to the position it held before the illegal search. Attenuation instead "attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *United States v. Leon*, 468 U.S. 897, 911 (1984) (quoting *Brown*, 422 U.S. at 609 (Powell, J., concurring)). Nor does the attenuation doctrine concern the admissibility of the primary products of a constitutional violation. *See Elmore*, 18 F.4th at 199. Whereas the inevitable discovery exception can save from exclusion any evidence connected to an illegal search—direct or derivative—the attenuation doctrine concerns secondary fruits. It asks whether an initial illegality so infects *derivative* evidence, discovered through subsequent lawful means, as to render it inadmissible.

These distinctions explain why many of the cases the parties rely on are out of place here. Take *United States v. Calhoun*, 49 F.3d 231 (6th Cir. 1995), which the government says is "controlling." There, upon executing a controlled delivery of narcotics, officers arrested the defendant and conducted an illegal protective sweep of her apartment. *Id.* at 233. The sweep uncovered no evidence. *Id.* at 233–34. Officers then obtained the defendant's consent and found a shotgun under her bed. *Id.* at 234. We held that the district court was right not to suppress the gun. *Id.* The illegal sweep uncovered no evidence and did not taint the defendant's consent to the subsequent search that did produce evidence. *Id.* Although it cited some inevitable discovery decisions, *Calhoun* is an attenuation case. The question it answered was whether evidence discovered pursuant to a consent search should have been suppressed as the "secondary fruit" of the illegal protective sweep. *Calhoun* had no occasion to consider the question presented here: whether, had the illegal sweep never occurred, the homeowner would have consented to a search that would have unearthed the gun. *Id.* at 235.

The same pattern emerges in many of the other cases referenced by the parties: officers conduct an illegal search, then obtain the defendant's consent to a subsequent search, and find the contested evidence in that subsequent search. The admissibility of that later-discovered

evidence turns on attenuation. *See, e.g.*, *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (evidence discovered during consent search conducted after illegal seizure suppressed because the "taint" of the seizure had not "dissipated"); *United States v. Lopez-Arias*, 344 F.3d 623, 626, 628–30 (6th Cir. 2003) (evidence found during consent search executed after unlawful seizure suppressed because there was "no intervening act of free will sufficient to break the causal chain"); *United States v. Buchanan*, 904 F.2d 349, 355–57 (6th Cir. 1990) (same).

By contrast, *Nix* provides an instructive example of a true inevitable discovery analysis. There, officers were conducting a large-scale search for the corpse of a murder victim; meanwhile, the suspect, Robert Williams, agreed to lead two other detectives to the corpse. 467 U.S. at 434–36. In light of Williams' statements, the officers called off the search. *Id.* at 436. Williams then led the officers to the body. *Id.* Williams later moved to suppress the body and related evidence. Despite finding a Fifth Amendment violation, *id.* at 437, the Court asked whether the corpse—the same evidence discovered using Williams' illegally obtained statements—inevitably would have been found anyway, *id.* at 448. The Court answered that question by looking at the state of affairs before Williams' illegal interrogation: the intentions of the officer coordinating the search, the direction the search was moving, its proximity to the body, and the instructions given to the searchers. *Id.* at 448–49. Based on that evidence, the Court concluded that "the volunteer search teams would have resumed the search had Williams not earlier led the police to the body and the body inevitably would have been found." *Id.* at 449–50. Put simply, the Court determined what would have happened had the illegality never occurred.

This court's inevitable discovery cases use the same mode of analysis. The disputed evidence is first discovered through an illegal search, and admissibility turns on whether the evidence still would have come to light had the search not happened. *See, e.g.*, *Kennedy*, 61 F.3d at 500–01 (drugs found during unlawful police search of lost luggage were admissible because, pursuant to company policy, airline would have opened the luggage anyway); *Bowden*, 240 F. App'x at 62 (drugs discovered during unlawful search were admissible because officers formed both the intention to seek and facts sufficient to obtain a warrant before starting the search, then actually obtained that warrant); *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir.

2001) (knives found during unlawful vehicle search were admissible because they would have been found during a standard inventory search when the vehicle was impounded).

B.

Our cases provide some useful guideposts for answering the hypothetical demanded by the inevitable discovery exception. While doing so inherently requires some conjecture, *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996), courts must "keep speculation at a minimum by focusing on 'demonstrated historical facts capable of ready verification or impeachment,'" *United States v. Ford*, 184 F.3d 566, 577 (6th Cir. 1999) (quoting *Nix*, 467 U.S. at 444 n.5). Our cases usually entail little guesswork because they involve routine practices: that an airline would, pursuant to its official policy, open the defendant's lost luggage, *Kennedy*, 61 F.3d at 500; that police would follow standard procedure to inventory a vehicle before having it towed, *United States v. Pritchett*, 749 F.3d 417, 437 (6th Cir. 2014); *Kimes*, 246 F.3d at 804; or that upon arresting a suspect, police would routinely search his person, *United States v. Mohammed*, 512 F. App'x 583, 589 (6th Cir. 2013), or ask for his name, *United States v. Stamper*, 91 F. App'x 445, 459 (6th Cir. 2004). Even without such a routine, evidence of police officers' intentions in a particular case may inform our judgment about what they would have done absent the illegality. *See, e.g.*, *Keszthelyi*, 308 F.3d at 575; *Bowden*, 240 F. App'x at 62; *see also Murray*, 487 U.S. at 540 n.2 (suggesting courts may rely on officers' post hoc, plausible assurances that they would have taken certain action). The risk of intolerable speculation increases, however, when the government's theory of discovery relies on the irregular actions of third parties. *See, e.g.*, *United States v. Stokes*, 733 F.3d 438, 447 (2d Cir. 2013) (finding it not inevitable that hotel staff would have opened bag left in guest room because there was no evidence of such a policy or routine). In all events, the court must "view[] affairs as they existed at the instant before the unlawful search" and focus on "demonstrated historical facts," *Kennedy*, 61 F.3d at 498, to determine what would have happened in the absence of the unlawful search.

That's not to say that events during and after an unlawful search are off the table. The scope of a later search may, for example, inform whether a hypothetical search would have uncovered the disputed evidence. Comparing *Nix* and our decision in *Keszthelyi* is instructive in this regard. In *Nix*, the independent investigation never actually discovered the challenged

evidence, so the Court's analysis focused on what the investigation would have revealed. 467 U.S. at 448–50. *Keszthelyi*, by contrast, had a ready answer to that question. After an officer seized cocaine during an illegal search of the defendant's home, the same officer was part of a nearly identical search two days later that was supported by probable cause developed independently of the illegal search. 308 F.3d at 574–75. "The fact that the lawful . . . search covered the same area, and involved many of the same agents, as the illegal . . . search minimize[d] our need to speculate about whether the cocaine inevitably would have been discovered during the later lawful search." *Id.* at 575.

More to the point here, our unpublished decision in *United States v. Pihlblad*, 142 F.3d 437, 1998 WL 165150 (6th Cir. 1998) (table) (per curiam), illustrates how consent given after an illegal search may play a role in an inevitable discovery analysis that, as in this case, must ask not only whether certain evidence would have been found, but whether consent would have been given, absent the illegal search. The defendant, Jeffrey Pihlblad, lived in Misty Parker's home while on parole. *Id.* at *1. The two got into an argument late one evening that ended with Parker fleeing the house and calling police to report that Pihlblad was suicidal. *Id.* Police arrived at the home and, after persuading Pihlblad to come out peacefully, conducted a protective sweep that recovered a rifle. *Id.* Parker then voluntarily signed consent-to-search forms. *Id.* We affirmed the denial of Pihlblad's motion to suppress the rifle because the inevitable discovery exception applied, even though Parker's consent came after the protective sweep. *Id.* at *5. And on those facts, it made good sense to conclude that Parker would have consented even if the protective sweep had never occurred. After all, it was Parker herself who initially contacted police because "she wanted them to help [Pihlblad]," *id.* at *1, a sentiment reinforced by her later consent.

But subsequent events also carry an entanglement problem. Because inevitable discovery asks what would have happened had the illegality not occurred, courts may rely on post-illegality events only if they would have occurred in that counterfactual scenario. Sometimes it is relatively easy to isolate the causal effects of the illegality. Courts, for example, may excise the tainted portions of a warrant application and reassess probable cause. *E.g.*, *Keszthelyi*, 308 F.3d at 575. But disentanglement is often not that easy, and it's particularly difficult—though not impossible—when the contested evidence is an oral statement. *See United States v. Vasquez De*

*Reyes*, 149 F.3d 192, 195–96 (3d Cir. 1998) ("[A] statement not yet made is, by its very nature, evanescent and ephemeral. Should the conditions under which it was made change, even but a little, there could be no assurance the statement would be the same."). When relying on subsequent events to prove inevitability, "what counts is whether the actual illegal search had any effect" on those events. *Murray*, 487 U.S. at 542 n.3.

C.

With these principles in mind, we turn back to this case. The district court largely engaged in an attenuation analysis focused on whether Walton's subsequent consent was sufficiently attenuated from the illegal protective sweep. That was the wrong legal test. The district court's finding of attenuation shows merely that the causal link was too remote to justify suppression of any evidence found during the consent search. *Strieff*, 136 S. Ct. at 2061. But there was no such evidence. The gun was seized during the initial unlawful search, so inevitable discovery, not attenuation, is the right tool for the job. When the district court did briefly use that tool, the court did not, as it should have, examine the circumstances as they existed just before the protective sweep to determine what would have happened had the protective sweep never occurred.

In fairness, the district court bears little blame for the mistake. In response to the suppression motion, the government offered an inevitable discovery argument consisting of a few conclusory sentences, and the parties offered even less on the topic during the suppression hearing, which was largely focused on the legality of the protective sweep. The record likewise contains scant evidence of the state of affairs just before the protective sweep, facts surely relevant to properly applying inevitable discovery. But the district court nonetheless focused on the wrong legal standard, which warrants a remand so the district court can apply the correct test in the first instance. On remand the court should focus on the following questions: If the illegal protective sweep had never happened, would officers have sought Walton's consent to search? Would Walton have given her consent in such a hypothetical world? And would the ensuing consent search have led to the gun? The inevitable discovery exception applies only if the answer to all three questions is "yes."

\* \* \*

We VACATE the district court's judgment and REMAND for further proceedings.