NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0140n.06

Case No. 25-1187

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 16, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff - Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| ANTJUAN PIERRE JACKSON, | ) | |
| Defendant - Appellant. | ) | OPINION |
| | ) | |

Before: McKEAGUE, LARSEN, and RITZ, Circuit Judges.

**RITZ, Circuit Judge.** A jury convicted Antjuan Pierre Jackson of two fentanyl-related drug charges. Jackson now argues that the district court erred in denying his motion to suppress and his claim that the government engaged in race discrimination during jury selection. We affirm.

**BACKGROUND**

**I.    Facts**

**A.    Jackson's drug-related activities**

On November 23, 2022, a confidential informant (CI) told police in Kalamazoo, Michigan, that the CI could procure narcotics from "Mr. X."[1] After ensuring the CI possessed no contraband, the police authorized the CI to purchase narcotics from Mr. X at a predetermined location while under police surveillance. Officers call this a "controlled buy." RE 40, First Warrant, PageID 123.

The CI called Mr. X to purchase oxycodone pills, but Mr. X was "out of narcotics and needed to go get them." *Id.* After the call, police saw Mr. X go to Apartment 10 of the Matterhorn

---

[1] Mr. X is a pseudonym used during Jackson's trial to refer to a third-party drug dealer.

Townhomes, which was Jackson's residence. Mr. X knocked on the door, entered, and stayed for a short period of time. Once Mr. X left Jackson's apartment, Mr. X went directly to the predetermined location to deliver the pills to the CI. Police later learned that the pills contained fentanyl. Police also learned that Jackson pled guilty in 2014 to a felony charge for possession of a controlled substance.

A few days later, on November 26, 2022, police responded to an emergency call at the Matterhorn Townhomes. Police found Shawn White, a resident of Matterhorn Townhomes Apartment 4, dead in his apartment from a fentanyl and methamphetamine overdose. On White's cell phone, police found multiple calls and text messages between White and Jackson, which police interpreted as coded drug deals.

For example, on November 15, 2022, Jackson and White exchanged the following text messages:

| | |
|---|---|
| White: | "Hey its shawn. Do u buy F. Stamps. Just wondering" |
| Jackson: | "Yea" |
| Jackson: | "What u got" |
| White: | "100 for 50" |
| Jackson: | "Ok I got a 50 for you" |
| White: | "Ok ill be there home in 10" |
| White: | "U home" |
| Jackson: | "Yea" |

*Id.* at PageID 120. On November 17, 2022, Jackson and White texted further:

| | |
|---|---|
| White: | "Hey u home. I got paid" |
| Jackson: | "Whats good bro" |
| White: | "Was wanting to grab that card if u were finished w" |
| Jackson: | "Ok" |
| Jackson: | "Give me a sec ill text u" |
| White: | "Ok" |
| Jackson: | "U ready" |
| White: | "Yeah I'll be there in a sec" |
| White: | "I knocked and waited idk. Im home again" |

*Id.* at PageID 120-21.  Around November 19, 2022, Jackson and White texted again:

| | |
|---|---|
| White: | "Can I stop down there?" |
| Jackson: | "Whatbu need" |
| White: | "I'm broke till payday or this unemployment hits my" |
| Jackson: | "Ok" |

*Id.* at PageID 121; RE 114, PSR, PageID 559.  And on November 20, 2022, Jackson and White texted:

| | |
|---|---|
| White: | "Hey can I stop over" |
| Jackson: | "How many nails u need" |
| White: | "20" |
| Jackson: | "I'll hit u in a lil" |
| White: | "Ok" |

RE 40, First Warrant, PageID 121; RE 114, PSR, PageID 559.  Finally, on November 23, 2022, which was the last day White was seen alive, White texted Jackson "I got 100," and Jackson called White twenty-six minutes later.  RE 40, First Warrant, PageID 122; RE 114, PSR, PageID 559.  This message was the last message sent from White's phone, and this call was the last he received.

On December 13, 2022, police surveilled Jackson's apartment.  They saw a man in a face mask matching Jackson's height, weight, and build unlock the door to Apartment 10 and enter.  Police also observed this same man leave the apartment several times, walk to the parking lot out of sight, and then return to the apartment a short time later.  Police interpreted this behavior as "indicative of drug deals" originating from Jackson's apartment.  RE 40, First Warrant, PageID 123-24.

**B.  Warrants and searches**

On December 14, 2022, a detective obtained a search warrant for Jackson's apartment.  In support of the warrant, the affiant included the information discussed above, as well as his

interpretations of these facts, based on his seven years of experience with over 675 narcotics investigations.

Police conducted the search the following day. When police arrived, Jackson was outside his apartment on the sidewalk. Jackson fled on foot, but officers arrested him and found a cell phone on his person. Police conducted an initial search of the phone and found a photograph of blue pills similar to the fentanyl pills sold to the CI in the controlled buy. The photograph showed the pills inside a sock that matched a sock later found in Jackson's apartment. During the apartment search, police also recovered a digital scale, a bag containing 86.84 grams of fentanyl, and a bag containing methamphetamine pills.

Police interviewed Jackson. Although Jackson's story changed several times, he eventually admitted that he sold marijuana, cocaine, and heroin, and that he had sold marijuana to White. But Jackson denied selling heroin to White, and he also denied knowing White was dead.

A few days later, on December 20, 2022, police obtained a second warrant to conduct a full forensic analysis of Jackson's phone. This second search revealed additional evidence, including: photographs of pills; photographs of cash; photographs of powder on a scale; messages between Jackson and a contact labeled "Plug" (which is "a term drug dealers use to describe their source of supply"); messages between Jackson and White; and messages discussing "blues" and large sums of money. RE 114, PSR, PageID 560-62.

## II. Procedural history

A grand jury charged Jackson with distribution of fentanyl resulting in death (Count I), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possession of more than 40 grams of fentanyl with intent to distribute (Count II), in violation of 18 U.S.C. § 841(a)(1) and (b)(1)(B)(vi).

### A.     Motion to suppress

Jackson filed a motion to suppress evidence collected from the apartment and the initial cell phone search.  Jackson argued that police unlawfully searched his apartment because the affidavit did not establish probable cause, and police unlawfully searched his cell phone because the first warrant did not authorize the initial search of the phone.  The district court ruled that there was probable cause to support the warrant, and, although the court was "a little on the fence" about the initial cell phone search, the court found the inevitable discovery doctrine cured any unlawfulness.  RE 61, Hr'g Tr., PageID 219.

### B.     *Batson* challenge

Jackson went to trial.  During voir dire, he raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), alleging that the government impermissibly struck Black[2] jurors based on their race.  In the jury venire, there were three Black jurors: Juror No. 22, Juror No. 5, and Juror No. 41.  All three were called during voir dire as prospective jurors: Juror No. 22 in seat ten, Juror No. 5 in seat three, and Juror No. 41 as an alternate in seat fourteen.

The government used two of its five peremptory strikes on Juror No. 22 and Juror No. 5 (in that order), while Juror No. 41 was eventually seated and sworn in as an alternate juror.  After the government struck Juror No. 5, Jackson raised his *Batson* challenge.  Jackson noted that the government had used 40% of its peremptory challenges to strike two Black jurors, "leaving . . . zero" Black jurors on the jury, outside of the alternates.  RE 131, Trial Tr., PageID 770.

---

[2] During the *Batson* challenge, the parties used several terms to refer to the challenged jurors, including "people of color," "African American," and "Black" jurors.  RE 131, Trial Tr., PageID 770-73 (citation modified).  We refer to these jurors as Black jurors.

### 1.      Juror No. 22

During the *Batson* sidebar, the parties discussed the government's strike of Juror No. 22. But before Jackson had the opportunity to explain why he believed the government's strike of Juror No. 22 was discriminatory, the government jumped in to offer two race-neutral explanations for the strike. First, the government explained that Juror No. 22 "expressed concerns . . . [with] being able to handle some childcare and being available, which . . . goes to her ability to pay attention and really hear the evidence from beginning to end." *Id.* at PageID 771. This referred to a portion of voir dire in which Juror No. 22 raised her hand and shared that she worked weekends as a flight attendant, while her husband worked weekdays, so she was the only childcare for her two young children during the week. The court had asked whether it was "attainable" for her husband to watch the children during the week if she were impaneled, to which Juror No. 22 responded "yes." *Id.* at PageID 663. Second, the government explained that Juror No. 22 had apparently "nodded along" when the potential jurors were asked "whether addicts are at fault [for taking drugs] . . . rather than the dealers being held at fault," which suggested that she would struggle to hold a drug dealer responsible for an overdose death. *Id.* at PageID 771.

Other jurors also voiced availability- and attention-related concerns during voir dire, but the government did not strike them. For example, Juror No. 94 stated that she was the primary caregiver and "stay-at-home mom" for "two littles at home." *Id.* at PageID 715, 726. She explained that it was "a little hard for [her husband] to get off work, but if he needed to, he could." *Id.* at PageID 726. And immediately after Juror No. 22's colloquy with the court, Juror No. 53 raised her hand to note that she "very much respect[s] the civic duty" of serving on a jury, but "just . . . wanted to offer that" she was a school board member, and the school board had its "annual evaluation of the superintendent" that week. *Id.* at PageID 663. Juror No. 53 noted that she was

"the only one [on the board]" who could "do the evaluation" but the board could still proceed without her, and she was "just offering that as what's going on." *Id.* at PageID 663-64.

### 2. Juror No. 5

During the *Batson* sidebar, the parties also addressed the government's strike of Juror No. 5. Jackson argued that striking Juror No. 5 would remove "the only person of African American heritage in our . . . lineup of 12," and there was no "true reason to strike" Juror No. 5. *Id.* at PageID 771. The government alleged that it struck Juror No. 5 because when she was asked about the defendant's right to remain silent, she said that "it all depends," because "sometimes when you talk they have a chance of twisting things up so they like to remain silent." *Id.* at PageID 712. Based on this response, the government inferred that Juror No. 5 would "take a dim view of police tactics" or "be against law enforcement." *Id.* at PageID 769, 772. Jackson alleged that this race-neutral reason was pretextual and insufficient because Juror No. 5 made it clear she could be fair and impartial, and the twist-up statement was merely a "stray comment." *Id.* at PageID 771-73.

Another juror, Juror No. 73, voiced sentiments about law enforcement but was not struck. Juror No. 73 stated that his girlfriend's father and brother were in law enforcement, and they had "expose[d] the other side o[f] the blue," or as "some would say[,] . . . [the] shadier side." *Id.* at PageID 672, 698.

### 3. The district court's *Batson* ruling

Ultimately, the district court denied Jackson's *Batson* challenge. The district court accepted the government's race-neutral explanations and found that Jackson had not "carried his burden" on the "third [*Batson*] determination" because Jackson's "statistics and . . . desire to see

people of color" on the jury were insufficient to "prov[e] purposeful discrimination." *Id.* at PageID 774.

### C. Conviction and appeal

The impaneled jury convicted Jackson on both counts. The district court sentenced Jackson to 324 months in prison, and he timely appealed.

## ANALYSIS

### I. The district court did not err in denying Jackson's motion to suppress.

When reviewing the denial of a motion to suppress, we review the district court's legal determinations, including whether probable cause existed, de novo and its factual findings for clear error. *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc), *cert. denied*, 145 S. Ct. 603 (2024).

### A. The warrant affidavit established probable cause to search the apartment.

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation." U.S. Const. amend. IV (citation modified). "In general," and in the circumstances here, the Fourth Amendment requires that "a search or seizure . . . be supported by probable cause" to be lawful, *Schulkers v. Kammer*, 955 F.3d 520, 537 (6th Cir. 2020), and, where "an unlawful search or seizure" occurs, "the exclusionary rule prohibits introduction of [the] evidence," *United States v. Cooper*, 24 F.4th 1086, 1092 (6th Cir. 2022) (citation modified).

Generally, probable cause exists when, "given all the circumstances set forth in [an] affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In analyzing the sufficiency of a warrant affidavit, we consider whether there was a "*nexus* between the place to be searched and

the evidence sought." *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (citation modified). Although the probable-cause inquiry is "limited" to the "four corners of the affidavit," *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009), it "is not a high bar to clear," *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc) (citation modified). Rather, probable cause is a "common sense" inquiry that "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 310-11 (citation modified). We afford "the magistrate's probable-cause determination . . . great deference." *Id.* at 311 (citation modified).

Here, the affidavit identified several facts and inferences that, taken together, established a fair probability that contraband or evidence of a crime would be found at Jackson's apartment. First, the affidavit identified repeated text messages between Jackson and White, a known drug user, in which White discussed selling food stamps to Jackson, purchasing "nails" from Jackson, and visiting Jackson's apartment to complete the transactions. RE 40, First Warrant, PageID 120-21. These messages were sent in the ten or eleven days prior to White's overdose death and the last of them were the final communications White appears to have had with anyone. The affiant, based on his narcotics-investigation experience and the overall context of the investigation, reasonably inferred that these messages were coded language indicating that Jackson sold narcotics out of his apartment. *See United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) ("Though the two used coded language, it is reasonable to believe that during this [text message] conversation, [the defendant] agreed to bring drugs to [a drug-user]."). The affidavit's recitation of Jackson's prior drug conviction added to the probable-cause calculus. *See United States v. Payne*, 181 F.3d 781, 790-91 (6th Cir. 1999).

The affidavit also contained observations from police surveillance of Jackson's apartment. To review, when the CI called Mr. X, a known drug dealer, to purchase drugs, Mr. X told the CI that Mr. X was out of drugs and needed to restock. After that call, Mr. X went to Jackson's apartment, entered, and then—immediately after leaving—delivered pills to the CI. Though Jackson did not directly sell drugs to the CI, it was reasonable for police to infer that Jackson supplied Mr. X and that these "activit[ies] [were] consistent with drug dealing" at Jackson's apartment. *United States v. Tisdale*, 980 F.3d 1089, 1094 (6th Cir. 2020); *see also Sanders*, 106 F.4th at 462 (explaining that when "officers, after observing a person leave a location, soon find the individual possessing contraband, possibly even engaging in a sale involving the contraband," it may "suggest[] that the illicit materials came from the location").

Later, police also saw a man resembling Jackson repeatedly leave Jackson's apartment, go to the parking lot for a short time, and then return to the apartment. Although police could not confirm that the man in the parking lot was Jackson, nor that any narcotics exchange occurred, it was reasonable for police to infer that this conduct was "indicative of drug deals" originating from Jackson's residence. RE 40, First Warrant, PageID 124; *see also United States v. Woodall*, No. 23-5989, 2024 WL 3221395, at *1-2 (6th Cir. June 28, 2024) (suggesting that where police observed the defendant "leave [his] house wearing a backpack, spend a short time with others, and return," police could infer in good faith that "this behavior suggested drug sales").

Jackson points to *United States v. Hython*, 443 F.3d 480 (6th Cir. 2006), a case in which officers lacked probable cause when their search warrant relied on a single, unreliable controlled buy and scant other suggestion of potential illegal activity at a specific residence. *See id.* at 486 & n.1. But the warrant here does not suffer from the shortcomings that were present in *Hython*. Here, police observed a known drug dealer communicate an intent to procure narcotics, enter

Jackson's apartment and, immediately after, sell narcotics to a CI. And unlike *Hython*, police presented other evidence unrelated to the controlled buy—Jackson's text messages with White and parking lot surveillance—to support probable cause.

Jackson's reliance on *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009), *abrogated on other grounds by DePierre v. United States*, 564 U.S. 70, 79 (2011), also fails. In *Higgins*, we held that there was no probable cause where police neither "attest[ed] to the informant's reliability" nor offered any corroborating information to establish a nexus between the defendant's apartment and the evidence sought. *Id.* at 389-90. Here, even if the affidavit did not address the CI's reliability, the other evidence sufficiently corroborated the nexus between Jackson's apartment and the narcotics evidence sought. *See United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004).

Based on the "totality of the circumstances," the warrant affidavit had enough to support a fair probability that evidence of a crime would be found at Jackson's apartment. *Sumlin*, 956 F.3d at 885 (citation modified). We therefore affirm the denial of Jackson's motion to suppress the evidence found in his apartment.

B. **The evidence from the initial cell phone search would inevitably have been discovered.**

We also affirm the district court's ruling as to the initial cell phone search. Even if the first warrant did not authorize that search, the inevitable discovery doctrine applies.

Cell phones are unique among the "variety of personal items" police may find on "an arrestee." *Riley v. California*, 573 U.S. 373, 392 (2014). Due to "their immense storage capacity," ability to contain highly "intimate" and "private information," and omnipresence in people's daily lives, police must "get a warrant" to search "a cell phone seized incident to an arrest." *Id.* at 393-97, 403. "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.* at 382.

Here, Jackson claims the initial cell phone search was unlawful, because the first warrant authorized police to seize and search only those cell phones found *inside* Jackson's apartment. The warrant stated:

> The person, place or thing to be searched is . . . the structure commonly referred to as 3409 W Michigan Ave apartment 10, City of Kalamazoo. . . . Also to be searched are any grounds, rooms, closets, cell phones, storage spaces, persons, vehicles in control of the occupants/residents, and/or appurtenant structures located on the premise of 3409 W Michigan Ave apartment 10.

RE 40, First Warrant, PageID 118 (citation modified). Jackson's argument is that the phrase "in control of the occupants/residents" modifies only "vehicles," so the cell phone found on his person (while he was *outside* the apartment) fell outside the warrant's scope. *Id.*

Jackson's argument has some legs, as the warrant lacks clarity. But we need not decide whether the initial cell phone search was legal, because the admission of cell phone evidence was proper under the inevitable discovery doctrine. The inevitable discovery doctrine is "an exception to the exclusionary rule" that "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Nix v. Williams,* 467 U.S. 431, 444 (1984)); *see also Cooper*, 24 F.4th at 1091-92 (quoting *Utah v. Strieff*, 579 U.S. 232, 238 (2016)). Inevitable discovery applies in two situations: (1) where "there is an independent, untainted investigation that was bound to uncover the same evidence," or (2) where "other compelling facts demonstrate that discovery was inevitable." *Cooper*, 24 F.4th at 1091 (citation modified). We have held that the second category of inevitable discovery applies where "a potentially illegal search was followed by a search conducted in accordance with a valid search warrant premised on evidence of probable cause developed independently of the initial search." *United States v. Bowden,* 240 F. App'x. 56, 61 (6th Cir. 2007) (citation modified); *see also United*

*States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002); *Murray v. United States*, 487 U.S. 533, 541-42 (1988). "The government bears the burden of showing that the" inevitable discovery doctrine applies. *Cooper*, 24 F.4th at 1091.

Here, the government obtained a second warrant to perform a full forensic search of Jackson's cell phone only a few days after the initial search. Jackson does not dispute the validity of this second warrant, which was not based on any evidence from the initial search of Jackson's cell phone. The second warrant instead relied on evidence obtained separately from the initial cell phone search, including the text messages between Jackson and White obtained from White's phone, as well as the fentanyl and other evidence obtained during the lawful search of Jackson's apartment. Additionally, the affidavit supporting the second warrant stated that "drug traffickers cannot operate unless they can communicate," which often requires "phone calls, text messages," "photographs," and "videos" that would be stored on their cell phones. RE 40-1, Second Warrant, at PageID 129.

So, because the evidence presented in the second warrant was obtained independently from the initial cell phone search, "it is relatively easy to isolate the causal effects of the illegal[]" cell phone search and conclude that the non-illegal events, by themselves, would have led to the second warrant to search Jackson's cell phone. *Cooper*, 24 F.4th at 1095; *see also Murray*, 487 U.S. at 535-36, 541-42 (finding the inevitable discovery doctrine applies where the warrant application "did not mention the prior [illegal] entry [or] . . . observations made during that entry"). Accordingly, the district court did not err in denying Jackson's motion to suppress evidence from the initial cell phone search.

## II.     The district court did not clearly err in denying Jackson's *Batson* challenge.

We also affirm on Jackson's jury-selection claim.  Although Jackson preserved his *Batson* challenge as to both Juror No. 22 and Juror No. 5, the district court did not clearly err.

"The Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."  *Batson*, 476 U.S. at 89 (citation modified).  Indeed, "in the eyes of the Constitution, one racially discriminatory peremptory strike is one too many."  *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019) (citation modified).  So "*Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race."  *Snyder v. Louisiana*, 552 U.S. 472, 476 (2008) (citation modified).  First, the defendant "must make a prima facie showing that a peremptory challenge" was based on race.  *Id.*  Second, if the defendant has alleged a prima facie case, then "the prosecution must offer a race-neutral basis for striking the juror in question."  *Id.* at 476-77.  Third, "the trial court must determine whether the defendant has shown purposeful discrimination," *id.*, which includes "whether the prosecutor's stated reasons [to strike] were the actual reasons or instead were a pretext for discrimination," *Flowers*, 588 U.S. at 298.

To prove purposeful discrimination, the defendant may "present a variety of evidence," including "statistical evidence," "evidence of a prosecutor's disparate questioning" of jurors, "side-by-side comparisons of [B]lack prospective jurors" and white prospective jurors, "a prosecutor's misrepresentations of the record," "relevant history of the State's preemptory strikes in past cases," and "other relevant circumstances."  *Id.* at 301-02.

At step two of the *Batson* inquiry, "a party's explanation for its decision to strike is neutral if it is based on something other than the race of the juror."  *United States v. Jackson*, 347 F.3d 598, 606 (6th Cir. 2003) (citation modified).  "Once the defending party proffers a race-neutral

reason, the challenging party, who always bears the ultimate burden of persuasion, must show that the explanation is merely a pretext for a racial motivation." *Braxton v. Gansheimer*, 561 F.3d 453, 459 (6th Cir. 2009).

At step three, a trial court should not "perfunctorily accept a race-neutral explanation without engaging in further investigation." *Jackson*, 347 F.3d at 605. "The critical question . . . at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338-39 (2003) (citation modified). "Implausible," "improbable," or "[un]reasonable," explanations "may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* at 339 (citation modified). For example, if "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Upshaw v. Stephenson*, 97 F.4th 365, 378 (6th Cir. 2024) (alteration in original) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005)). But "[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *United States v. Hackett*, 762 F.3d 493, 499 (6th Cir. 2014) (quoting *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam)); *Rice v. Collins*, 546 U.S. 333, 338 (2006).

"On direct review, the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact" and is "accorded great deference on appeal." *United States v. Odeneal*, 517 F.3d 406, 419 (6th Cir. 2008) (citation modified). We review such a decision "under a clearly erroneous standard," *United States v. Mahbub*, 818 F.3d 213, 223 (6th Cir. 2016) (citation modified), "which requires a definite and firm conviction that a mistake has been committed," *United States v. Castano*, 906 F.3d 458, 467 (6th Cir. 2018) (citation modified).

Importantly, *Batson* "seeks to protect the rights of the litigants, the venire, and the 'entire community.'" *Rice v. White*, 660 F.3d 242, 253 (6th Cir. 2011) (quoting *Batson*, 476 U.S. at 86-88). So, where a *Batson* error is found, "only reversal of the conviction and a new trial could remedy" the error. *United States v. Tomlinson*, 764 F.3d 535, 539 (6th Cir. 2014).

**A.      Jackson preserved his *Batson* challenge regarding Juror No. 22.**

There is no dispute that Jackson preserved his Batson challenge to Juror No. 5. We also find that Jackson preserved his *Batson* challenge regarding Juror No. 22. We have "h[e]ld that a strictly contemporaneous objection is not required" to raise or preserve a *Batson* challenge, "and that a party's *Batson* objection is timely if it is made before the jury is sworn and the trial commences." *Tomlinson*, 764 F.3d at 537; *see also Haight v. Jordan*, 59 F.4th 817, 854 (6th Cir. 2023) (per curiam). This "is a sensible rule" because "early in the jury selection procedure, defense counsel [may] not fully appreciate whether the government's use of peremptory challenges form[s] a pattern of [discrimination.]" *Tomlinson*, 764 F.3d at 538 (citation modified).

Our decision in *Hines v. City of Columbus*, 676 F. App'x 546 (6th Cir. 2017), is instructive. In *Hines*, a plaintiff asserted a *Batson* challenge concerning two prospective jurors only after the defense struck the second juror. *Id.* at 551-52. We explained that the plaintiff "timely" raised his *Batson* challenge for both jurors "once the purported pattern of race-based peremptory challenges occurred (even though the challenge was not made at the time [the first juror] was struck)." *Id.* However, we found that the *Hines* plaintiff ultimately "failed to make a record . . . sufficient to preserve the [*Batson*] issue for appeal" because he "made no effort to have the district court follow the second and third *Batson* steps" as to the first juror. *Id.*

As in *Hines*, Jackson timely raised his *Batson* challenge to Juror No. 22 and Juror No. 5 because he raised it after he perceived a pattern of discriminatory strikes when the government

struck Juror No. 5. But unlike in *Hines* where "defense counsel did not offer any explanation for peremptorily striking [the first juror,] [and] the district court did not ask defense counsel to give one," *id.* at 551, here the prosecutor explained that "there were a couple of reasons" for "the strike of [J]uror 22": availability, attention concerns, and nodding at the prosecutor's question regarding who bore responsibility for overdose deaths, RE 131, Trial Tr., PageID 770-71. Where the government offers "a race-neutral reason for the challenge" before the trial court addresses the defendant's prima facie case, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *United States v. Russ*, 508 F. App'x 377, 384 (6th Cir. 2012) (quoting *Hernandez*, 500 U.S. at 359). Thus, we find that Jackson timely raised and sufficiently preserved his *Batson* challenge regarding the government's strike of Juror No. 22.

**B.     The district court did not clearly err at step three of the *Batson* analysis.**

Jackson claims that the district court erred at step three of the *Batson* inquiry when it found no purposeful discrimination. In support of his position, Jackson relies on a comparative juror analysis, statistical evidence, and an alleged misrepresentation by the government. But, on the record before us, Jackson has not shown clear error.

**1.     Comparative juror analysis**

As an initial matter, we can consider Jackson's comparative juror analysis evidence, even though he failed to raise this argument below. Although it is "not *always* compelled at the appellate level," comparative juror analysis "is an important tool that courts *should* use on appeal." *United States v. Atkins*, 843 F.3d 625, 637 (6th Cir. 2016) (citation modified). Indeed, "it is appropriate to conduct a comparative juror analysis for the first time on appeal" specifically "when: (i) the government purportedly strikes a venireperson because of an answer to a [voir dire] question"; "(ii) venirepersons relevant to the comparison were asked the same question"; "(iii) the relevant

venirepersons actually answered that question in similar depth; and (iv) the purpose of the analysis is to show that the government treated jurors with similar answers differently." *Id.* at 636 (first citing *Snyder*, 552 U.S. at 482-84; then citing *Dretke*, 545 U.S. at 242-44). Based on these principles, we find that, like *Atkins*, "the record before us is sufficient to conduct a fair comparative juror analysis." *Id.* at 635-36.

In a comparative juror analysis, "[i]f a prosecutor's proffered reason for striking a [B]lack panelist equally applies to an otherwise-similar nonblack [panelist] who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Odeneal*, 517 F.3d at 420 (quoting *Dretke*, 545 U.S. at 232). And "[a]lthough a *Batson* challenger 'is not required to identify an *identical* white juror for the side-by-side comparison,' the differences must not be 'significant,' or 'meaningful.'" *Hunt v. Sunquist*, 822 F. App'x 468, 478 (6th Cir. 2020) (first quoting *Flowers*, 588 U.S. at 311-12; then quoting *Atkins*, 843 F.3d at 632; and then quoting *United States v. Simon*, 422 F. App'x 489, 495 (6th Cir. 2011)).

Here, Jackson's comparative juror analysis does not demonstrate that the district court clearly erred in rejecting his *Batson* challenge. For Juror No. 5, Jackson argues that the government's race-neutral explanation—that Juror No. 5 took a "dim view" of law enforcement because she implied that law enforcement may "twist[] things up" when a defendant speaks—was pretextual because Juror No. 73, a white juror, offered similar sentiments but was not struck. RE 131, Trial Tr., PageID 698, 712, 769. But the context of Juror No. 5's and Juror No. 73's statements shows that these two jurors were not "similarly situated." *United States v. Torres-Ramos*, 536 F.3d 542, 559 (6th Cir. 2008). To illustrate, Juror No. 73 stated that his girlfriend's brother and father worked in law enforcement and her father was "a trusting, truthful man, but" was "not so one-sided for the blue." RE 131, Trial Tr., PageID 698. Juror No. 73 went

on to say that his girlfriend's father would tell him "what it's really like to be a police officer" and how "there can be . . . a shadier side" of police. *Id.*

As the government points out, Juror No. 73's statements presented a more nuanced view of law enforcement than Juror No. 5 did because, while Juror No. 73 noted exposure to a "shadier" side of the police force, he also spoke enthusiastically about "talk[ing] to [his girlfriend's] dad all the time about . . . his time in the force." *Id.* at PageID 672. So the government could reasonably understand Juror No. 73's statements to be less one-sided than Juror No. 5's statement, which suggested that law enforcement may "twist[] things up." *Id.* at PageID 712. And Jackson presents no further juror comparators to undermine the government's claimed reason for striking Juror No. 5. Thus, Jackson's comparative analysis does not show that the district court clearly erred in rejecting his *Batson* challenge as to Juror No. 5.

As to Juror No. 22, Jackson also presents a brief comparative juror analysis for the government's first claimed concern of availability and attention. Jackson states that Juror No. 94 and Juror No. 53 offered similar statements but were not struck. These jurors' statements, though, were not comparable to Juror No. 22's statements. As pointed out by the government, Juror No. 94 framed her childcare comment as something she merely "wanted to mention," and voluntarily offered that her husband could get off work if needed. *Id.* at PageID 726. In contrast, Juror No. 22 affirmatively raised her hand to discuss her childcare concerns when the court asked whether any jurors had a "serious scheduling conflict." *Id.* at 662. And Juror No. 53's work-event scheduling concern was substantively different in kind than Juror No. 22's ongoing childcare concerns. Ultimately, Jackson's cursory mention of these alleged comparator jurors does not carry his "burden of persuasion" or show that the district court clearly erred. *Braxton*, 561 F.3d at 459.

Moreover, Jackson failed to present any comparative juror evidence regarding the government's second claimed concern for Juror No. 22: that Juror No. 22's nodding indicated she agreed that drug-dealers could not be responsible for overdose deaths. And Jackson contests neither the fact that Juror No. 22 nodded, nor the government's inference about what that nod meant. In fact, Jackson has failed to challenge the government's second explanation at all, so he cannot show it was motivated by race. *See United States v. Stevens*, No. 22-5410, 2023 WL 3200322, at *2 (6th Cir. May 2, 2023).

### 2.    Statistical evidence

Jackson's proffered statistical evidence, without more, likewise fails to establish clear error. Jackson explains that "[t]he government used 40% of its peremptory strikes on Black jurors despite the fact that Black jurors composed only 16% of the [jury pool]," which reduced the number of Black jurors on the jury (excluding alternates) to zero. CA6 R. 20, Appellant Br., at 30-31. And the district court noted that it was "sensitive to the rarity, unfortunately, of getting people of color on a jury in the Western District of Michigan." RE 131, Trial Tr., PageID 773. But the district court seemed to credit the government's rebuttal that it had only struck two Black jurors, and another Black juror remained on the jury as an alternate. *Id.* at PageID 772-774. Ultimately, the district court found that Jackson's "statistics" did not prove purposeful discrimination in this instance. *Id.* at PageID 774.

The statistics Jackson presents now are no different than those presented to the district court, and they do not appear facially egregious. *Cf. Flowers*, 588 U.S. at 288 (noting that the government struck "41 of the 42 [B]lack prospective jurors" across six trials). So we decline to second-guess the district court's finding on clear error review.

### 3.      Misrepresentation

For the first time on appeal, Jackson also argues that the government misrepresented Juror No. 5's "twist[] things up" statement when it implied that the statement showed a "dim" view of law enforcement.  RE 131, Trial Tr., PageID 712, 769.  But, even if Jackson had preserved this argument, the district court appeared to credit the government's interpretation of Juror No. 5's statement when it found that "for [the] purpose of a peremptory challenge I think" the government has "provided a race neutral explanation" for striking Juror No. 5.  *Id.* at PageID 774.  Jackson has not presented a reason to believe that the district court's finding was erroneous.

\* \* \*

Ultimately, Jackson has not carried his burden to show that the district court's decision to credit the government's race-neutral explanations was clearly erroneous.  Even considering Jackson's evidence cumulatively, "the totality of the evidence," *Atkins*, 843 F.3d at 641, does not create a "firm conviction that a mistake has been committed," *Castano*, 906 F.3d at 467 (citation modified).

### CONCLUSION

The district court properly denied Jackson's motion to suppress and did not clearly err in denying Jackson's *Batson* challenge.  Accordingly, we affirm.